UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

STEPHANIE SIMMONS,

      Plaintiff,

v.                                  Case No:  5:14-cv-438-Oc-39PRL

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.

      Defendants.

_____/

# O R D E R

Stephanie Simmons has sued the Florida Department of Corrections ("FDOC"),[1] and six (6) FDOC health-care providers, alleging, inter alia, that the medical care she received while a prisoner in FDOC custody was inadequate, violating her Eighth Amendment rights under the United States Constitution.[2]  Specifically, Ms. Simmons alleges that each named health-care provider was deliberately indifferent to her serious medical needs, resulting in permanent nerve and joint damage, visual impairment, nystagmus, speech impairment, and permanent loss of her motor skills, leaving her

---

[1] Plaintiff's Amended Complaint also named Lowell Correctional Institution ("LCI") as a Defendant.  FDOC has represented that LCI is not a separate legal entity.  Rather, LCI is a separate operating unit of FDOC.  In any event, Plaintiff's Amended Complaint does not name LCI as a Defendant in any of the three Counts, and as such, LCI is due to be dismissed without prejudice.

[2] "The Fourteenth Amendment governs claims of medical indifference to the needs of pretrial detainees while the Eighth Amendment applies to claims of convicted prisoners."  Youmans v. Gagnon, 626 F.3d 557, 563 n.6 (11th Cir. 2010); Andujar v. Rodriguez, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007).  The distinction is not important, however.  Because the standard for providing medical care to pretrial detainees is the same as the standard for providing medical care to convicted prisoners, precedent decided under either amendment is applicable.  Youmans, 626 F.3d at 563 n.6.

wheelchair bound.  Ms. Simmons brings a claim under 42 U.S.C. § 1983 against her health-care providers, and two state-law claims against FDOC.

In two separate motions, the Defendants[3] have moved the Court [Docs. 29, 38; Motions], pursuant to Federal Rule of Civil Procedure 12(b)(6), for an Order dismissing Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted. Ms. Simmons has responded in opposition [Docs. 30, 39; Responses].  As such, the matters are ripe for review.

## I.   FACTUAL BACKGROUND[4]

On April 21, 2010, Ms. Simmons began serving her prison sentence as an inmate at Lowell Correctional Institution, a women's prison operated by the FDOC in Marion County, Florida.  (Am. Compl., Doc. 27 ¶¶ 7, 18).  On that date, she was in her normal state of health, which consisted of ambulating, taking care of herself, and speaking well. (Id. ¶ 19).  Nevertheless, after arriving at LCI, Ms. Simmons was bitten by a tick and infected with Lyme disease.  (Id. ¶ 21).  While the Amended Complaint does not allege an exact date of the tick bite, shortly after her arrival at LCI, Ms. Simmons began

---

[3] Defendant, Yadirma Colon filed a separate Motion to Dismiss [Doc. 38] on April 22, 2015, which is substantially similar to the motion filed by Defendants, FDOC, Robert A. Delp, Luz Rosario, Witchner Belizaire, and Page A. Smith on October 10, 2014.  For purposes of this Order, "Defendants" means FDOC, Robert A. Delp, Luz Rosario, Witchner Belizaire, Page A. Smith, and Yadirma Colon, collectively.  As will be discussed infra, Defendant L. Dabin has not been served with process, and the time for doing so has long-since passed.

[4] Defendants' Motions admit the facts of Plaintiff's Amended Complaint and Demand for Jury Trial [Doc. 27; Amended Complaint] for purposes of their motions to dismiss.  Ward v. Hudnell, 366 F.2d 247, 249 (5th Cir. 1966) ("It is axiomatic that a motion to dismiss an action for failure to state a claim upon which relief can be granted admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts.").

frequenting the Health Services department where she complained of skin rashes, vomiting, diarrhea, numbness in her extremities, and headaches.  Ms. Simmons was examined on April 27, 2010 and reported having a skin rash.  (Id. ¶ 22).  Robert Delp, a Senior Physician at LCI, diagnosed Simmons with ringworm and prescribed antifungal cream for the skin rash.  (Id.  ¶¶ 10, 22).  On May 6, 2010, Ms. Simmons reported numbness in her legs, vomiting, and diarrhea for three days.  (Id. ¶ 23).  Ms. Simmons was unable to walk and had dark circles under her eyes.  (Id.).  She was referred for a medical evaluation, at which time she complained of, inter alia, frequent headaches.  (Id.).

The next day, Ms. Simmons again reported to the Health Services department where she indicated that she had a skin rash on both arms since April 23, 2010.  (Id. ¶ 25).  A skin infection/rash assessment was performed on Ms. Simmons, which uncovered a rash on Ms. Simmons' legs, arms, and right side.  (Id.).  Ms. Simmons was given hydrocortisone cream and referred to a clinician.  (Id.).  Later on May 7, 2010, Ms. Simmons was examined by Y. Colon,[5] a Senior Physician at LCI, at which time she complained of ringworms in her arms and legs that were getting bigger, and a left earache.  (Id. ¶ 27).  Ms. Simmons was diagnosed with ringworm and prescribed cream to apply two times per day.  (Id.).  On May 8, 2010, Simmons reported to the Health Services department again, with a self-declared medical emergency.  (Id. ¶ 28).  Ms. Simmons complained of vomiting, her legs going numb, she could not walk, and her headaches had gotten worse.  (Id.).  She was referred to a doctor, given Maalox and emetral, and

---

[5] Plaintiff named "Yaritza Colon" as a Defendant, but later learned that she served the wrong "Y. Colon."  See (Doc. 7).  Plaintiff subsequently had a new summons issued for "Y. Colon" (Doc. 31), and effectuated service of process on March 10, 2015.  See (Return, Doc. 36).

told to drink as much water as she could tolerate. (Id.). The next day, May 9, 2010 at 12:10 a.m., Ms. Simmons again reported to Health Services and an IV was started. (Id. ¶ 29). At 7:45 a.m., Ms. Simmons complained to Health Services staff of weakness and aches all over. (Id. ¶ 30). Ms. Simmons was assessed and offered Tylenol and ibuprofen for her pain. (Id.). On May 10, 2010, Ms. Simmons was admitted to the infirmary and continued to complain of a headache. (Id. ¶¶ 33-34). On May 10, 2010, Colon examined Ms. Simmons and ruled out viral syndrome. (Id. ¶ 35). Ms. Simmons was given Phenergan and IV hydration. (Id.).

On May 11, 2010, Colon again examined Ms. Simmons, and determined that she was to be transported to Reception Medical Center ("RMC") in Union County, Florida to rule out meningitis. (Id. ¶ 36). On May 11, 2010, Ms. Simmons was transported to RMC and then admitted to Memorial Hospital Jacksonville ("MMCJ") for treatment. (Id. ¶ 37).

The Amended Complaint does not allege what occurred during the remainder of the month of May or the first few days of June. Nevertheless, on June 7, 2010, after treatment at MMCJ, Ms. Simmons was discharged back to RMC with a diagnosis of "cerebritis exact etiology unknown and/or Lyme disease with cerebellitis." (Id. ¶ 38). The discharge summary included the following:

> [t]his patient needs very close observation by infectious disease [sic] and neurologist. If Dr. Gama's clinic available [sic] to see the patient weekly, we will keep the patient at RMC and follow-up with Dr. Gama's clinic weekly. If patient can see Dr. Pella weekly, we will continue with weekly follow-up at Dr. Pella's clinic. If the patient cannot see Dr. Gama weekly then she needs to be transported weekly at least to see Dr. Nabizadeh for neurology here at the Depart [sic] of Corrections, Memorial Hospital, Jacksonville.

(Id.). Importantly, the discharge summary also noted the following:

> [t]his patient's care is not finished by any stretch of imagination [sic]. She needs close ID (infectious disease) and neurology follow up. She needs close clinician daily follow up. She needs physical therapy, speech therapy and occupational therapy daily.

(Id. ¶ 39). On June 7, 2010, Page Smith, Medical Executive Director at RMC, performed an Admission History and Physical Examination on Ms. Simmons. (Id. ¶¶ 13, 40). Smith noted that Ms. Simmons needs further treatment and that Ms. Simmons was to follow up with infectious disease and neurology at Memorial Hospital every two weeks. (Id. ¶ 40). Beginning on June 8, 2010, Witchner Belizaire, a Senior Physician at RMC, and other medical and nursing staff at RMC followed Ms. Simmons' progress. (Id. ¶¶ 41, 42).

On July 22, 2010, Ms. Simmons was seen at MMCJ, where she complained of persistent ataxia and nystagmus. (Id. ¶ 43). The impression was "Lyme disease with neurological involvement." (Id.). MMCJ stated that Ms. Simmons needs "continued physical therapy," and that MMCJ would evaluate as to "whether or not there is improvement of her inflammation in the cerebellum, most particularly in the vermis." (Id.).

The Amended Complaint does not allege what occurred from July 22, 2010 until October of 2010, but on October 7, 2010, Ms. Simmons was transferred from RMC back to LCI where she stayed until she was released on July 31, 2011. (Id. ¶ 44). "While in the custody of the FDOC at RMC and LCI, Simmons was never provided with the medical treatment or speech, physical and occupational therapy prescribed in the Discharge Summary from MMCJ on June 7, 2010 or the continued physical therapy prescribed in the July 22, 2010 consultation from MMCJ." (Id. ¶ 45).

Ms. Simmons alleges that, "[a]s a result of the tick bite and/or viral infection, and the failure to provide medical treatment and speech, physical and occupational therapy to [her] at LCI and RMC, [she] suffered symptoms including headaches, dizziness,

nausea, loss of consciousness, fever, skin rash, incontinence, ataxia, permanent nerve and joint damage, visual impairment, nystagmus, speech impairment and permanent loss of motor skills to the point that she is now wheelchair bound." (Id. ¶ 46).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper if a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). While "detailed factual allegations" are not required, mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are not enough. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In considering a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations in the Complaint must be accepted as true and construed in the light most favorable to the Plaintiff. See Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003).

## III.    DISCUSSION

Plaintiff's Amended Complaint purports to allege the following three causes of action: (1) premises liability; (2) negligent training and supervision; and (3) inadequate medical care, pursuant to 42 U.S.C. § 1983. See generally (Am. Compl., Doc. 27). The Court will address each count in turn, looking to Florida substantive law to determine the merits of Plaintiff's state law claims. Jones v. United Space Alliance, L.L.C., 494 F.3d 1306, 1309 (11th Cir. 2007) ("[W]e apply substantive Florida law to state claims heard on the basis of supplemental jurisdiction . . . ."); see Erie R. Co. v. Tompkins, 304 U.S. 64 (1938); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).

As a threshold issue, Plaintiff has not effectuated service of process on Defendant

"L. Dabin," despite two extensions of time within which to do so. See (Orders, Docs. 15,

33).[6]  In pertinent part, Federal Rule of Civil Procedure 4(m) provides:

> If a defendant is not served within 120 days after the complaint
> is filed, the court--on motion or on its own after notice to the
> plaintiff--must dismiss the action without prejudice against that
> defendant or order that service be made within a specified
> time. But if the plaintiff shows good cause for the failure, the
> court must extend the time for service for an appropriate
> period.

Fed. R. Civ. P. 4(m).  Rule 4(m) affords two safety hatches to plaintiffs who fail to

effectuate service of process in a timely manner: (1) showing good cause for the failure,

or (2) convincing the court to use its discretion to extend the deadline.  Lau v. Klinger, 46

F. Supp. 2d 1377, 1380 (S.D. Ga. 1999); see Horenkamp v. Van Winkle & Co., 402 F.3d

1129, 1132 (11th Cir. 2005) ("Rule 4(m) grants discretion to the district court to extend

the time for service of process even in the absence of a showing of good cause.").  Having

already granted Plaintiff two lengthy extensions within which to serve process on

Defendant L. Dabin, the Court declines to extend the deadline a third time.  Indeed, since

granting the Plaintiff the last extension, Plaintiff has filed an affidavit of non-service as to

Defendant L. Dabin [Doc. 35].  Further, Plaintiff has the burden of demonstrating the

existence of "good cause" for an extension, Suzie's Structures, Inc. v. Ziegler, No. 809-

CV-975-T-33TGW, 2009 WL 3668267, at *1 (M.D. Fla. Oct. 26, 2009), and has not moved

---

[6] The Court first entered an Order on August 25, 2014, extending Plaintiff's
deadline to serve process to December 2, 2014.  See (Order, Doc. 15). On December
19, 2014, the Court then granted Plaintiff an additional 120 days, until April 1, 2015, by
which to serve process on Defendant L. Dabin.  See (Order, Doc. 33). In the second
Order, the Court cautioned Plaintiff that "this is the second 120 day extension Plaintiff has
received . . . and the Court will not be inclined to grant another lengthy extension should
Plaintiff fail to serve Defendants within the permitted timeframe."  (Id. at 2).

the Court for a third.  The Court declines to grant a third extension <u>sua sponte</u>.  As such,

Defendant L. Dabin is due to be dismissed from this action without prejudice.[7]  Having

resolved this preliminary issue, the Court now turns to the merits of Defendants' Motions.

### A.    Count I — Premises Liability (FDOC)

It is elementary that a negligence claim under Florida law requires the coalescence

of the following elements: a legal duty owed to the Plaintiff, and a breach of that duty,

which proximately causes the Plaintiff's damages.  <u>Paterson v. Deeb</u>, 472 So. 2d 1210,

1214 (Fla. 1st DCA 1985).  The Amended Complaint alleges that "FDOC negligently failed

to provide Simmons with reasonably safe housing at LCI by failing to remove the ticks

from the premises, by failing to provide pest control services at LCI to eliminate the ticks

from the premises and by failing to warn Simmons that there were ticks on the premises

that FDOC knew or should have known about."  (Am. Compl. ¶ 50).  FDOC argues that it

owed Ms. Simmons no legal duty to guard against <u>ferae naturae</u>, or animals of wild

disposition, such as ticks.  (Motion, Doc. 29 at 5-10).

Generally speaking, in Florida,

> the law does not require the owner or possessor of land to
> anticipate the presence of or guard an invitee against harm
> from animals Ferae naturae unless such owner or possessor

---

[7] The Court is mindful that the statute of limitations may bar a future action against Defendant L. Dabin for conduct that allegedly occurred in 2010 and 2011.  <u>Ellison v. Lester</u>, 275 F. App'x 900, 901-02 (11th Cir. 2008) ("[W]e have held that the four-year statute of limitations under Fla. Stat. § 95.11(3) applies to § 1983 claims arising in Florida." (citing <u>Chappell v. Rich</u>, 340 F.3d 1279, 1283 (11th Cir. 2003)).  Nevertheless, in light of the two lengthy extensions already granted to Plaintiff in this case, as well as the fact that Plaintiff has not requested a third extension or otherwise shown any cause for granting it, the Court declines to use its discretion and extend the deadline again.  <u>See</u> <u>Lepone-Dempsey v. Carroll Cnty. Comm'rs</u>, 476 F.3d 1277, 1282 (11th Cir. 2007) ("Although the running of the statute of limitations, which barred the plaintiffs from refiling their claims, does not require that the district court extend time for service of process under Rule 4(m), it was incumbent upon the district court to at least consider this factor.").

has reduced the animals to possession, harbors such animals, or has introduced onto his premises wild animals not indigenous to the locality.

Wamser v. City of St. Petersburg, 339 So. 2d 244, 246 (Fla. 2d DCA 1976).  The ferae naturae doctrine traces its roots back to the Roman Empire where wild animals were presumed to be owned by no one specifically, but by the people generally.  Hanrahan v. Hometown Am., LLC, 90 So. 3d 915, 918 (Fla. 4th 2012).  It takes into account the unpredictability and uncontrollability of wild animals.  Id.

Florida courts have decided a number of cases under the doctrine, see, e.g., Hanrahan, 90 So. 3d 915 (dealing with fire ants that attacked plaintiff when he brushed up against bushes outside in a mobile home park, and stating "Appellees did not harbor, introduce, or reduce the fire ants to possession"); Palumbo v. State Game & Fresh Water Fish Comm'n, 487 So. 2d 352, 353 (Fla. 1st DCA 1986) (dealing with an alligator bite in a lake); Wamser, 339 So. 2d 244 (dealing with a shark attack at a beach); see also Riley v. Champion Int'l Corp., 973 F. Supp. 634, 636 (E.D. Tex. 1997) (holding that the defendant did not have a duty to guard plaintiff, an independent contractor logger, from ticks, when the plaintiff contracted Lyme disease from a tick bite while harvesting timber on defendant's land), but those cases do not fit these facts like a glove.  The instant case does not involve injuries from an animal attack that took place in the animal's natural habitat.   This is a case in which Plaintiff alleges that she was bitten by a tick and infected with Lyme disease after arriving at a prison facility on April 21, 2010.  (Am. Compl., Doc. 27 ¶ 21).  In fact, because of her confinement, Ms. Simmons was not in the natural habitat of ferae naturae; she was in a location under the strict control and regulation of the FDOC when the bite occurred.  Therefore, the Court finds that the cases dealing with injuries

sustained from an attack by a wild animal in the animal's natural habitat are factually inapposite.

Rather, the Court looks to cases in which individuals sustained injuries in artificial structures under the control of the Defendant. For instance, in St. Joseph's Hospital v. Cowart, a black widow spider bit Mr. Cowart while he was a patient at the hospital. 891 So. 2d 1039, 1040 (Fla. 2d DCA 2004). Mr. Cowart and his wife sued the hospital under a number of theories, including a negligence claim, which the Second District Court of Appeal described as "essentially a premises liability action against the landowner-hospital by a business invitee." Id. A jury awarded damages to the plaintiffs. The Court of Appeal reversed. In doing so, the Second DCA noted that "[n]o Florida cases specifically address a premises liability action based on a spider or insect bite," but "Florida law holds that landowners do not have a duty to guard an invitee against harm from wild animals, except in certain circumstances not applicable here." Id. at 1041. In Cowart, the plaintiffs presented no evidence that the hospital knew the black widow spider was on its premises. Id. at 1042. Indeed, the plaintiffs' own expert testified that the hospital records failed to disclose a black widow spider infestation, and nothing established that anyone else had been bitten by a black widow at the hospital. Id. As such, the hospital had no duty to warn Mr. Cowart of a danger of which it had no knowledge. Id. The Cowart decision is consistent with other Florida courts which have held that a landowner can be negligent with regard to wild animals found in artificial structures, but that the landowner must have known of the unreasonable risk of harm posed by the animal.

> We do not say a landowner can never be negligent with regard to the indigenous wild animals found on its property. A premises owner could be negligent with regard to wild animals found in artificial structures or places where they are not

> normally found; that is, stores, hotels, apartment houses, or
> billboards, if the landowner knows or should know of the
> unreasonable risk of harm posed by an animal on its
> premises, and cannot expect patrons to realize the danger or
> guard against it.

Hanrahan, 90 So. 3d at 918-19.

In Nicholson v. Smith, a decision relied upon by both the Hanrahan and Cowart courts, the Texas Court of Appeals distinguished between liability for injuries sustained from wild animals in their natural habitat, and injuries sustained from wild animals in artificial structures. Nicholson, 986 S.W.2d 54 (Tex. App. 1999). In Nicholson, the plaintiff's husband rented space at a recreational park owned by the defendants. Id. at 57. At least one week after the husband set up camp, he was stung more than 1,000 times by fire ants while correcting the stabilizer on the underside of his house trailer. Id. He was taken to a local hospital and subsequently died. Id. His widow brought suit against the park and its owners, alleging a variety of causes of action. The defendants moved for summary judgment on the plaintiff's premises liability claim, arguing that they did not owe a duty to the husband with respect to the fire ants. Id. at 59. The trial court granted the motion and the Texas Court of Appeals affirmed. The Nicholson court stated, "[the husband] was attacked by indigenous wild animals in their natural habitat, in the normal course of their existence . . . [and] [t]he Smiths did nothing to cause the fire ants to act outside of their expected and normal behavior." Id. at 62. Importantly, however, like the Hanrahan court, the Nicholson court stated:

> A premises owner could be negligent with regard to wild
> animals found in artificial structures or places where they are
> not normally found; that is, stores, hotels, apartment houses,
> or billboards, if the landowner knows or should know of the
> unreasonable risk of harm posed by an animal on its
> premises, and cannot expect patrons to realize the danger or
> guard against it.

Nicholson, 986 S.W.2d at 62.  Few courts have actually imposed such a duty on

landowners, see, e.g., DeLuce v. Fort Wayne Hotel, 311 F.2d 853, 857 (6th Cir. 1962)

(setting aside judgment and remanding for trial where an actress was bitten by a foot-

long rat in a hotel lobby and the evidence suggested that the hotel's employees were

aware that rats entered freely from the alley and took no precautions to prevent it);

Carlson v. Alaska, 598 P.2d 969, 973-74 (Alaska 1979) (reversing and remanding for trial

in a case where the plaintiff was mauled by a bear when the bear was attracted to the site

of the attack by garbage that had accumulated on state-owned property and the plaintiff's

theory was that the state created a dangerous situation, knew the situation was

dangerous, and failed to either correct the situation or warn people of the danger);

CeBuzz, Inc. v. Sniderman, 466 P.2d 457, 458 (Colo. 1970) (en banc) (holding that the

defendant's knowledge of presence of banana tarantulas in the last shipment of bananas

to the store gave rise to liability for a bite to a shopper); Brasseaux v. Stand-By Corp.,

402 So. 2d 140, 144 (La. Ct. App. 1981) (holding a motel liable for injury caused when

plaintiff slipped and fell in the shower while trying to avoid being stung by bees coming

out of shower head, and basing liability on the fact that the defendant knew bees were

outside motel, had hired beekeeper to remove the bees, and failed to warn plaintiff of

bees near his room), and indeed, Plaintiff cites no such cases in her Response.

Nevertheless, the court has little difficulty concluding that Plaintiff has pled

sufficient facts to survive FDOC's Motion, which admits the facts of the Amended

Complaint.  Indeed, Plaintiff alleges that "[a]fter arriving at LCI on April 21, 2010, Simmons

was bitten by a tick and infected with Lyme disease," (Am. Compl., Doc. 27 ¶ 21), and

that "[p]rior to [her] incarceration at LCI, FDOC knew or should have known there were

ticks on the premises and that those ticks presented a dangerous condition to inmates such as Simmons," (id. ¶ 49). Assuming the veracity of these allegations, Plaintiff has stated a cause of action for premises liability under Florida law. Wamser, 339 So. 2d at 246 ("[T]he law does not require the owner or possessor of land to . . . guard an invitee against harm from animals Ferae naturae unless such owner or possessor . . . harbors such animals . . . ." (emphasis added)). Plaintiff's Amended Complaint alleges that FDOC knowingly harbored and exposed its inmates to ticks capable of spreading disease, like the Lyme disease Ms. Simmons contracted here. While evidence may or may not support this proposition, at this juncture, Ms. Simmons has pled sufficient facts.[8]

As to Count I of Plaintiff's Amended Complaint, Defendants' Motion is denied.

## B.   Count II — Negligent Training and Supervision (FDOC)

Count II purports to be a cause of action against FDOC for its alleged negligent training and supervision of the Individual Defendants. Plaintiff claims that "FDOC owed [her] a duty of care to properly train and supervise its medical physicians and nursing staff to recognize and treat health conditions such as Lyme disease and other viral infections in inmates," and "FDOC negligently failed to properly train and supervise its medical physicians and nursing staff to" do so. (Am. Compl., Doc. 27 ¶¶ 53-54). Plaintiff alleges

---

[8] FDOC cites Butcher v. Gay, 34 Cal. Rptr. 2d 771 (Cal. Ct. App. 1994) in support of its argument. The Butcher court, like the cases cited above, recognized the following:

> In other words, without evidence that a defendant knew or reasonably should have known there was any danger or potential danger associated with that defendant's act or failure to act, any imposition of liability would in essence be the imposition of liability without fault.

Id. (emphasis added). Plaintiff alleges that FDOC knew of the danger. (Am. Compl., Doc. 27 ¶ 49). Her Amended Complaint survives the Motion in this regard.

that she suffered damages as a result. (Id. ¶ 55). FDOC argues that it is immune from tort liability for this cause of action because the allegations in Count II concern discretionary functions, liability for which is barred by Florida's sovereign immunity. (Motion, Doc. 29 at 10-12).

Generally, the State of Florida and its subsidiaries are immune from tort liability. See Fla. Const. Art. X, § 13. However, Florida has waived this immunity "under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state." Fla. Stat. § 768.28(1). Nevertheless, even if a claim would subject a private person to liability, the waiver of sovereign immunity would still not apply if the challenged acts of the state agent were "discretionary" government acts rather than "operational" ones. Lewis v. City of St. Petersburg, 260 F.3d 1260, 1262 (11th Cir. 2001). A "discretionary" function is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." Kaisner v. Kolb, 543 So. 2d 732, 737 (Fla. 1989). An act is "discretionary" when all of the following conditions are met:

> (1) the action involves a basic governmental policy, program, or objective; (2) the action is essential to the realization or accomplishment of that policy, program, or objective; (3) the action require[s] the exercise of basic policy evaluation[s], judgment[s], and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possess[es] the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision.

Lewis, 260 F.3d at 1264 (citation omitted) (alterations in original). On the other hand, an "operational" function "is one not necessary to or inherent in policy or planning[] that

- 14 -

merely reflects a secondary decision as to how those policies or plans will be implemented." Id. The discretionary function exception to Florida's waiver of sovereign immunity is "grounded in the doctrine of separation of powers." Kaisner, 543 So. 2d at 736. "That is, it would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decisionmaking of the executive and legislative branches of government, including the agencies and municipal corporations they have created." Id. at 736-37.

The Eleventh Circuit has decided a number of cases under the doctrine. In Lewis, the district court dismissed a suit brought by the personal representative of an individual shot and killed by a law enforcement officer. 260 F.3d at 1261. The plaintiff brought a cause of action for negligent training, under Florida law, against the municipal defendant. Id. In pertinent part, the plaintiff claimed that the City "breached its duty to [the decedent] by failing to properly train its officers in how to handle a crisis management situation and failing to train its officers regarding the proper use of force in a crisis management situation," and that the breach caused the decedent's death. Id. at 1265. The Eleventh Circuit affirmed the district court's dismissal of the negligent training claim because it challenged "discretionary" governmental functions immune from tort liability. Id. at 1266. The Eleventh Circuit stated,

> Lewis does not challenge the implementation or operation of the City's police training program as it relates to the officers involved in the shooting, but rather Lewis challenges the City's policy decisions regarding what to include in the training of its police officers. A city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning.

Id. Therefore, because the plaintiff challenged the reasonableness of basic policy decisions made by the City, the "discretionary" function exception to the waiver of sovereign immunity applied and barred plaintiff's claim. Id. at 1266-67. Likewise, in Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida, an inmate at Monroe County Detention Center ("MCDC") committed suicide. 402 F.3d 1092 (11th Cir. 2005) [hereinafter Cook]. His personal representative brought suit alleging inter alia that the Sheriff was liable under Florida law for negligent supervision, training, and management of MCDC employees. Id. The district court entered judgment as a matter of law in favor of the Sheriff, and the Eleventh Circuit affirmed as to the negligent training and supervision claim. Id. Relying on Lewis, the Eleventh Circuit concluded that the challenged actions were the Sheriff's decisions regarding how to train its corrections officers and what subject matter to include in the training. Id. at 1118. Accordingly, the acts that the plaintiff challenged were discretionary governmental functions immune from tort liability. Id. at 1118-19.

Applying the foregoing authorities to the facts of the Amended Complaint reveals that Count II is due to be dismissed. While the Court is satisfied that FDOC owed a duty of care to Plaintiff, Battista v. Cannon, 934 F. Supp. 400, 406 (M.D. Fla. 1996) ("There is a duty among private employers who hire, retain, or supervise employees whose negligence or intentional acts in positions of employment can foreseeably cause injuries to third parties."); see Lewis, 260 F.3d at 1265 ("Under Florida law, an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents."), FDOC is nonetheless shielded from liability by state sovereign immunity. It is true that "sovereign immunity does not uniformly preclude claims against

- 16 -

the state and its subsidiaries for negligent training and supervision." Mosby v. Harrell, 909 So. 2d 323, 330 (Fla. 1st DCA 2005). However, it is also true that for Plaintiff to state a claim for negligent training, she must show that FDOC was negligent in the implementation or operation of a training program already in effect. See Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005) ("For Mercado to state a claim for negligent training, he must show that Orlando was negligent in the implementation or operation of the training program."). Indeed, Plaintiff must allege conduct that reflects "a secondary decision as to how [existing] policies or plans will be implemented." Lewis, 260 F.3d at 1264. But here, Plaintiff fails to allege the existence of any training program or policy, let alone how that training program or policy will or should be implemented. Plaintiff's sole allegation is that "FDOC negligently failed to properly train and supervise its medical physicians and nursing staff to recognize and treat health conditions such as Lyme disease and other viral infections in inmates." (Am. Compl. ¶ 54). However, as in Lewis and Cook, the determination of how to train health care providers and what subject matter to include in the training is a "discretionary" function, protected from tort liability. Because Plaintiff does not allege facts challenging the way in which a training program was implemented, FDOC is entitled to sovereign immunity on Plaintiff's negligent training claim. See Cook, 402 F.3d 1092; Lewis, 260 F.3d 1260.[9] Plaintiff's assertion that she "is

---

[9] Contrary to Plaintiff's argument, the Middle District of Florida did not hold that "the State of Florida has waived sovereign immunity for the negligent training and supervision of governmental employees" in Johnson v. Cannon, 947 F. Supp. 1567, 1574 (M.D. Fla. 1996). (Response, Doc. 30 at 4). In Johnson, the court found that "[t]he Complaint alleges facts which refer to the actual operation of the Sheriff's office." 947 F. Supp. at 1574. Therefore, upon those facts, the plaintiff there had "made allegations that relate to the operational function of the Pasco County Sheriff's office and the implementation of policies already in effect." Id. The same is not true here.

challenging the FDOC's implementation or operation of its training program as it relates to the medical staff involved in Plaintiff's care," (Response, Doc. 30 at 5), finds no support in the Amended Complaint. Grandrimo v. Parkcrest Harbour Island Condo. Ass'n, Inc., No. 8:10-CV-964-T-27MAP, 2011 WL 550579, at \*5 (M.D. Fla. Feb. 9, 2011) ("Plaintiff cannot amend the Complaint in her brief in opposition to a motion to dismiss.").

In addition, to state a claim for negligent supervision of its employees, Plaintiff is required to show that FDOC was put on notice of the harmful propensities of its employees. Mercado, 407 F.3d at 1162 (stating that, for a negligent supervision claim under Florida law, "Mercado must show that Orlando was put on notice of the 'harmful propensities of the employees.'"); see Willis v. Dade Cnty. Sch. Bd., 411 So. 2d 245, 246 n.1 (Fla. 3d DCA 1982) ("In order to state a cause of action for the tort of negligent hiring or retention recognized in Florida . . . a plaintiff must allege facts showing that the employer was put on notice of the harmful propensities of the employee . . . ."). Because Plaintiff has not alleged that FDOC knew or should have known that the Individual Defendants had "harmful propensities," her negligent supervision claim necessarily fails for this reason as well. Walker v. Palecek, No. 3:05-CV-760-J, 2006 WL 335803, at \*4 (M.D. Fla. Feb. 14, 2006) ("Because Plaintiff has not alleged that Defendant Seagraves knew or should have known that Defendant Palecek had 'harmful propensities or was otherwise unfit to serve as a police officer,' Plaintiff has not sufficiently stated a claim for negligent supervision and retention.").

Consequently, Count II is due to be dismissed.

## C.      Count III — Inadequate Medical Care, under 42 U.S.C. § 1983[10] (Health Care Providers)[11]

Inmates "must rely on prison authorities to treat [their] medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976).  Therefore, federal and state governments have a constitutional obligation to provide minimally adequate care to incarcerated individuals.  See id. at 104.  Prison officials violate that obligation "when they act with deliberate indifference to an inmate's serious medical needs, giving rise to a cause of action under § 1983" for a violation of the Eighth Amendment. McKeithen v. Jackson, No. 14-10492, 2015 WL 1424241, at *2 (11th Cir. Mar. 31, 2015).  However, "[m]edical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience

---

[10] The Individual Defendants argue that Count III should be construed as a medical malpractice claim and dismissed for failure to plead compliance with the pre-suit screening requirements of Chapter 766, Florida Statutes.  See (Motion, Doc. 29 at 17-19); (Motion, Doc. 38 at 8-10).  The argument lacks merit.  See Rolle v. Brevard Cnty., Florida, No. 606CV-714-ORL-19JGG, 2007 WL 328682, at *5 (M.D. Fla. Jan. 31, 2007) (rejecting defendants' argument that Chapter 766 bars Plaintiffs' Section 1983 claims and stating, "[s]uch argument is not persuasive, however, because Plaintiffs' claims have been brought under federal law and are separate and distinct from medical malpractice claims brought under state law."); see also Alvarez v. Brevard Cnty., Fla., No. 6:12-CV-1762-ORL-28, 2013 WL 1686115, at *2 (M.D. Fla. Apr. 18, 2013) (rejecting defendant's argument that a § 1983 claim was barred because plaintiffs failed to comply with the pre-suit notice requirements of Chapter 766, Florida Statutes, and stating "the claim against Circles is not a state law medical negligence claim but a § 1983 claim in which Plaintiffs allege that Circles acted not merely with negligence but with deliberate indifference to Linero's constitutional rights.").  Count III is a claim brought pursuant to 42 U.S.C. § 1983, not a state law medical malpractice claim.

[11] FDOC argues that Count III of Plaintiff's Amended Complaint should be dismissed with prejudice against FDOC because the allegations are barred as a matter of law by sovereign immunity. (Motion, Doc. 29 at 12-13).  Count III is not brought against FDOC; it is brought against the Individual Defendants.  Indeed, the "wherefore" clause of Count III only demands relief against Y. Colon, Robert Delp, L. Dabin, Luz Rosario, Witchner Belizaire, and Page Smith, all individually. (Amended Complaint, Doc. 27 at 13-14).  Count III is brought against the Individual Defendants in their individual capacities.

or to be intolerable to fundamental fairness.'" Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).  In contrast, mere medical malpractice does not rise to the level of a constitutional violation.  Id.

To prevail on a claim for deliberate indifference, a plaintiff must show "(1) a serious medical need;[12] (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).  The analysis contains both an objective and a subjective component. Gilmore v. Hodges, 738 F.3d 266, 274 (11th Cir. 2013).  A plaintiff must first show an objectively serious medical need.  Id.  A serious medical need can encompass "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Mann, 588 F.3d at 1307 (citation omitted).  "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition." Kuhne v. Fla. Dep't of Corr., 745 F.3d 1091, 1096 (11th Cir. 2014).  Second, the plaintiff must establish that the official acted with deliberate indifference. Gilmore, 738 F.3d at 274.  Not every allegation of inadequate medical treatment states a constitutional violation.  A plaintiff must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. Mann, 588 F.3d at 1307.  To satisfy the deliberate indifference element, Plaintiff must allege the following three facts: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by

---

[12] There does not appear to be much dispute that Plaintiff had a serious medical need. See generally (Motions, Docs. 29, 38).  To the extent there is, the Court finds that Plaintiff has alleged a serious medical need, satisfying the first element, at least at this juncture.

conduct that is more than [gross] negligence." Brown v. Johnson, 387 F.3d 1344, 1351

(11th Cir. 2004).[13] "The plaintiff must prove that the defendant 'actually knew' of the risk—

'[p]roof that the defendant should have perceived the risk, but did not, is insufficient.'"

Kruse v. Williams, 592 F. App'x 848, 856 (11th Cir. 2014) (citation omitted) (brackets in

original). Additionally, an official "who actually knew of a substantial risk to inmate health

or safety may be found free from liability if they responded reasonably to the risk, even if

the harm ultimately was not averted." Farmer v. Brennan, 511 U.S. 825, 844 (1994).

Third, a distinction must be made between deliberate indifference and negligence. See

McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (collecting categories of action

or inaction that may constitute deliberate indifference). "Conduct that is more than mere

negligence includes: (1) knowledge of a serious medical need and a failure or refusal to

provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care;

(4) a decision to take an easier but less efficacious course of treatment; or (5) medical

care that is so cursory as to amount to no treatment at all." McKeithen, 2015 WL 1424241,

at *2 (citing McElligott, 182 F.3d at 1255).

---

[13] The Eleventh Circuit has stated that deliberate indifference requires proof of more than gross negligence:

> Although we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of "more than mere negligence," McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999), our earlier holding in Cottrell, 85 F.3d at 1490, made clear that, after Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a claim of deliberate indifference requires proof of more than gross negligence.

Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010); see Johnson v. Razdan, 564 F. App'x 481, 485 n.4 (11th Cir. 2014) (same).

The Eleventh Circuit has had occasion to discuss the deliberate indifference standard a number of times. The cases establish the general notion that mere misdiagnosis or subpar care, even if it rises to the level of medical malpractice, does not constitute deliberate indifference. For instance, in Kruse, the personal representative of the estate of a pretrial detainee brought suit under 42 U.S.C. § 1983 claiming deliberate indifference to the serious medical needs of the pretrial detainee, which resulted in his death. 592 F. App'x at 849.[14] The pretrial detainee, Jacob Jordan, was diagnosed with Addison's disease as a teenager. Id. In 2010 he was arrested and taken to the Mobile County Metro Jail for failing to comply with a condition of release after pleading guilty to possession of marijuana and two hunting offenses. Id. After his arrival at the Mobile County Metro Jail, Jordan was transferred to the Baldwin County Corrections Center without any medical records. Id. However, the intake report stated that he "take[s] meds for Addison's disease" and "has Addison's disease." Id. (brackets in original). At 9:00 a.m. on July 8, 2010, nurse Pimperl examined Jordan at his request and wrote in Jordan's medical records that he had low blood pressure, he was feeling weak "like [he was] going to pass out," and that if his condition persisted, he would need to go to the hospital. Id. (brackets in original). Pimperl called the medical director who stated that no bloodwork was needed, and he prescribed Gatorade "for sodium replacement" and instructed Pimperl to administer 40 milligrams of Prednisone for three days and thereafter decrease the dosage. Id. at 850. At approximately 9:30 a.m., Pimperl gave Jordan a 40-milligram Prednisone pill and four glasses of Gatorade, and allowed Jordan to return to his cell with

---

[14] Because the issues in Kruse, like here, are so fact specific, the Court recounts the facts in great detail. Also, Kruse was a case brought under the Fourteenth Amendment, but the distinction is unimportant. See supra note 2.

a gallon of Gatorade. Id. At approximately 2:00 p.m., Williams, a licensed practical nurse, began her shift. Id. Jordan's medical records contain handwritten notes made by Williams at 4:00 p.m., 4:30 p.m., 6:30 p.m., 7:30 p.m. and 9:45 p.m. on July 8. At 4:00 p.m., officers called a "code blue" to request medical assistance at Jordan's cell. Id. Williams responded and found Jordan lying supine on the floor. Id. Jordan stated that he had "passed out," and stated that he needed to go to the hospital. Id. Jordan stated that, when he was at the Mobile County Metro Jail, they had taken him to the hospital and given him an IV, and that he felt worse now than then. Id. Williams arranged for Jordan to be moved to the medical block and placed on general watch. Id. At 4:30 p.m., Williams was informed that Jordan's mother called the medical unit and told staff that "[Jordan's] going to pass out!" Id. (brackets in original). Jordan's mother had seen him earlier that day at visitation, and she had said that Jordan needed to go to the hospital. Id. At 6:30 p.m., an officer called Williams and reported that Jordan was vomiting. Id. Williams noted that Jordan was moaning and that he said he needed to go to the hospital. Id. At this time, Williams called the medical director who verbally instructed Williams to give Jordan 25 milligrams of Phenergan — a sedative — and clear liquids such as chicken broth. Id. Williams administered the Phenergan intramuscularly and gave Jordan two cups of warm broth. Id. at 851. Williams' notes reflect that, at 7:30 p.m., an officer checked on Jordan, and Jordan was asleep. Id. At 8:00 p.m., an officer checked on Jordan, and Jordan was lying on the mat, watching television. Id. At 9:45 p.m. Williams personally checked on Jordan and noted that "Inmate lying in [sic] floor on mat. Pulled blanket up and closed his eyes. Hopefully going to sleep." Id. At 1:30 a.m. on July 9, 2010, a coroner pronounced

Jordan dead.  Id.  Addison's disease was the cause of death.  Id.  An investigation produced a statement by Jordan's cellmate, which was as follows:

> "JORDAN came in the cell ... about 4:45 P.M.", after which he "vomited and WALKER helped JORDAN to the restroom on several occasions" because "JORDAN was not able to move around or walk at all without being helped." "JORDAN told WALKER he was not going to make it[,]" but "WALKER helped JORDAN to drink some of his chicken broth and Gatorade." "[A]round 8:00 or 9:00 P.M.," a nurse "gave JORDAN a shot," and "JORDAN told WALKER again he was not going to make it through the night." "Around 11:00 P.M., WALKER helped JORDAN get situated on his mat on the floor then WALKER got back in his bunk." "A few minutes passed when JORDAN looked up at WALKER, smiled, took two deep breaths, closed his eyes and bowed his head." "WALKER ... touched [JORDAN] and could feel he was warm" and "asked him if he was alright," but he "did not answer." "After about five minutes WALKER went back over to JORDAN and [discovered that he] was cold to the touch, had no pulse and his lips were purple," at which time "WALKER then notified corrections officers...."

Id. (alterations in original).  The only claim at issue was Kruse's claim against Williams. The district court granted summary judgment in favor of Williams, reasoning that Williams did not act with deliberate indifference.  Id. at 855.  The Eleventh Circuit affirmed.  The Eleventh Circuit reasoned that "[u]ndisputed evidence established that Williams responded to Jordan's requests for medical care for his Addison's disease."  Id. at 856. This was not a case where an official knew that an inmate was in need of serious medical care but failed or refused to obtain treatment for the inmate.  Id. at 858.  Rather, "Williams did obtain medical treatment for Jordan by consulting with [the medical director] and administering his prescribed treatment."  Id.  "During the few hours that Jordan was under Williams's care on July 8, 2010, she promptly treated all of the symptoms of which she was made aware."  Id.  The Eleventh Circuit noted that, while Williams's diagnoses and

quality of care may have been subpar, they did not rise beyond a colorable claim of medical malpractice to deliberate indifference. Id. at 859.

On the other hand, Eleventh Circuit precedent is emphatic that, where officials have knowledge of the need for medical care and intentionally refuse to provide that care, they are deliberately indifferent to the needs of an inmate. See, e.g., Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) ("Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference."). For instance, in Kothmann v. Rosario, the plaintiff was a thirty-eight year old transgender person who was incarcerated at LCI for approximately one year. 558 F. App'x 907, 907 (11th Cir. 2014). The plaintiff was born physically a female, but lived as a male throughout his adult life. Id. at 908. Six years before his incarceration at LCI, the plaintiff was diagnosed with Gender Identity Disorder ("GID"), and received hormone therapy as part of his medical treatment for GID. Id. He alleged that the defendant, the Chief Health Officer at LCI, repeatedly denied his requests for hormone treatment and that his GID ultimately went completely untreated. Id. In pertinent part, the plaintiff alleged that (1) the medically-accepted treatment for GID was hormone treatment, living in the new gender full time, and surgery to change sex characteristics; (2) LCI's medical staff, including the defendant, knew that plaintiff had GID; (3) the defendant denied plaintiff's requests for hormone treatment; and (4) the defendant "vetoed" a prison doctor's referral of plaintiff to the endocrinology staff, who could prescribe hormone treatment. Id. The defendant filed a motion to dismiss or, in the alternative, for summary judgment, which the district court denied. Id. at 909. On appeal, the Eleventh Circuit affirmed, stating "we hold that [plaintiff] has alleged facts sufficient to

show that [defendant] knew that hormone treatment was the recognized, accepted, and medically necessary treatment for [plaintiff's] GID, yet knowingly refused [plaintiff's] repeated requests for such treatment and thus was deliberately indifferent to a serious medical need." Id. at 911. Therefore, plaintiff's allegations were sufficient to state a facially plausible Eighth Amendment claim. Id. As for qualified immunity, the Eleventh Circuit went on to hold that "by 1986, it was well settled in this Circuit that intentionally refusing to provide medically necessary treatment constitutes deliberate indifference and violates the Eighth Amendment." Id. at 912.

Applying the foregoing authorities to Plaintiff's Amended Complaint reveals that Count III survives Defendants' Motions, at least to some extent.  Upon close inspection, there are three separate aspects of Plaintiff's claim for deliberate indifference.  The first is that Defendants, Colon, Delp, Dabin, and Rosario failed to provide the level of diagnostic care necessary, prior to Plaintiff's diagnosis and treatment at MMCJ.  See, e.g., (Amended Complaint, Doc.  27 ¶ 61) (alleging that, prior to Plaintiff's diagnosis and treatment at MMCJ, Colon, Delp, Dabin and Rosario "intentionally or though deliberate indifference, failed or refused to provide [Plaintiff] with access to the medical care she needed in a reasonable period of time."); (Id. ¶ 63) ("The unreasonable delay in recognizing and treating [Plaintiff's] serious medical needs while at LCI resulted in ataxia, permanent nerve and joint damage, visual impairment, nystagmus, speech impairment and permanent loss of motor skills.").  The second is that, upon return to RMC from MMCJ, Defendants Belizaire and Smith were deliberately indifferent to Plaintiff's serious medical needs by "failing to carry out the prescribed discharge orders of the doctors at [MMCJ]." (Id. ¶ 64) ("Belizaire and Smith were aware of Simmons' diagnosis of cerebritis

- 26 -

and/or Lyme disease with cerebellitis and were aware that Simmons was at substantial risk of serious harm if she did not receive the treatment and therapy recommended on her discharge from MMCJ."). The third is that, upon return to LCI from RMC, Colon, Delp, Dabin, and Rosario were deliberately indifferent to Plaintiff's serious medical needs by "failing to carry out the prescribed discharge orders of the doctors at [MMCJ]." (Id. ¶ 67) ("Colon, Delp, Dabin and Rosario were aware of Simmons' diagnosis of cerebritis and/or Lyme disease with cerebellitis and were aware that Simmons was at substantial risk of serious harm if she did not receive the treatment and therapy recommended on her discharge from MMCJ."). Only the latter two survive Defendants' Motions.

The first aspect of Plaintiff's claim amounts to an assertion that Defendants Colon, Delp, Dabin, and Rosario failed to correctly diagnose and treat Plaintiff's Lyme disease, despite the fact that they did not yet know Plaintiff had Lyme disease. Indeed, Plaintiff claims that "Colon, Delp, Dabin, and Rosario were aware of Simmons' numerous ongoing complaints about headaches, weakness, dizziness, vomiting and bilateral leg numbness and requests for urgent medical care[,]" (Id. ¶ 61), but that "[t]he unreasonable delay in recognizing and treating [Plaintiff's] serious medical needs while at LCI resulted in ataxia, permanent nerve and joint damage, visual impairment, nystagmus, speech impairment and permanent loss of motor skills." (Id. ¶ 63). The Amended Complaint is replete with allegations showing that Plaintiff was assessed, examined, monitored, evaluated, prescribed medication, and referred to the hospital. See (id. ¶¶ 20 – 36). Indeed, Plaintiff began serving her prison sentence on April 21, 2010, and first reported a medical issue on April 27, 2010. (id. ¶¶ 18, 22). At that time, Delp examined Plaintiff and diagnosed her with ringworm, for which he prescribed antifungal cream for the skin. (Id. ¶ 22).

Plaintiff reported again on May 6, 2010, and was evaluated in Mental Health. (Id. ¶¶ 23, 24). On May 7, 2010, a skin infection/rash assessment was performed, Plaintiff was given hydrocortisone cream, referred to a clinician, and told to return in one week if there was no improvement. (Id. ¶ 25). Later on May 7, 2010, Plaintiff was again evaluated and referred to a doctor. (Id. ¶ 26). Yet again on May 7, 2010, Plaintiff was examined by Colon, diagnosed with ringworm and prescribed cream to apply twice per day. (Id. ¶ 27). Simmons was examined again on May 8, (id. ¶ 28), four times on May 9, (id. ¶¶ 29-32), three times on May 10, (id. ¶¶ 33-35), and finally transported to RMC on May 11, (id. ¶¶ 36-37). The Amended Complaint simply does not support the contention that Defendants Colon, Delp, and Rosario[15] were deliberately indifferent to Plaintiff's serious medical needs before she returned from MMCJ. The Eleventh Circuit has provided the following examples of situations that involve more than mere negligence: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. McKeithen, 2015 WL 1424241, at *2 (citing McElligott, 182 F.3d at 1255). None of those situations were present before Plaintiff was transported to RMC. Just like in Kruse — where the Eleventh Circuit noted that, while the diagnoses and quality of care may have been subpar, they did not rise beyond a colorable claim of medical malpractice to deliberate indifference — the diagnosis and quality of care here did not rise beyond a colorable claim of medical malpractice. Kruse, 592 F. App'x at 859; see

---

[15] The Court expresses no view as to Defendant "L. Dabin," who is due to be dismissed without prejudice.

Howell v. Evans, 922 F.2d 712, 721 (11th Cir. 1991) ("Estelle requires, however, not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment."); Adams, 61 F.3d at 1540 (reversing the district court's denial of summary judgment in a case in which an inmate died after a nurse examined a patient on several occasions, consulted with a doctor, and administered the prescribed treatment); see also Barr v. Florida Dep't of Corr., No. 10-21890-CV, 2011 WL 1365552, at *4 (S.D. Fla. Apr. 11, 2011) ("[A] misdiagnosis as Plaintiff has alleged does not rise to the level of deliberate indifference necessary for Plaintiff's 42 U.S.C. § 1983 claim."); Engelleiter v. Brevard Cnty. Sheriff's Dep't, 290 F. Supp. 2d 1300, 1308 (M.D. Fla. 2003) ("[M]atters for medical judgment, such as whether to order an X-ray or like measure, does [sic] not represent cruel and unusual punishment even if the action or lack thereof evinces medical malpractice."). The misdiagnosis of ringworm before Plaintiff was transported to RMC does not rise to the level of deliberate indifference necessary to support an action under 42 U.S.C. § 1983, as a matter of law. At most, it is medical malpractice. In this regard, Defendants' Motions are due to be granted in part — Plaintiff's Amended Complaint fails to state a claim against Colon, Delp, and Rosario for conduct that occurred prior to when Plaintiff was transported to RMC on May 11, 2010.

The same is not true for the remaining aspects of Count III. Plaintiff claims that, on May 11, 2010, she was transported to RMC and then admitted to MMCJ for treatment. (Id. ¶ 37). On June 7, 2010, after treatment at MMCJ, Ms. Simmons was discharged back to RMC with a diagnosis of "cerebritis exact etiology unknown and/or Lyme disease with cerebellitis." (Id. ¶ 38). Importantly, her discharge summary stated the following:

> [t]his patient needs very close observation by infectious disease [sic] and neurologist. If Dr. Gama's clinic available [sic] to see the patient weekly, we will keep the patient at RMC and follow-up with Dr. Gama's clinic weekly. If patient can see Dr. Pella weekly, we will continue with weekly follow-up at Dr. Pella's clinic. If the patient cannot see Dr. Gama weekly then she needs to be transported weekly at least to see Dr. Nabizadeh for neurology here at the Depart [sic] of Corrections, Memorial Hospital, Jacksonville.
>
> . . . .
>
> [t]his patient's care is not finished by any stretch of imagination [sic]. <u>She needs close ID (infectious disease) and neurology follow up.  She needs close clinician daily follow up. She needs physical therapy, speech therapy and occupational therapy daily</u>.

(Id. ¶¶ 38-39) (emphasis added).  First, Ms. Simmons claims that, upon return to RMC, Defendants Belizaire and Smith "were aware of Simmons' diagnosis of cerebritis and/or Lyme disease with cerebellitis and were aware that Simmons was at substantial risk of serious harm if she did not receive the treatment and therapy recommended on her discharge from MMCJ," but they "fail[ed] to carry out the prescribed discharge orders of the doctors at [MMCJ]."  (Id. ¶ 64).  The Amended Complaint alleges that Defendants Belizaire and Smith "failed or refused to provide Simmons with the medical treatment and daily physical, speech and occupational therapy prescribed on the June 7, 2010 Discharge Summary from MMCJ."  (Id.).  Ms. Simmons alleges that, "[h]ad Belizaire and Smith provided Simmons with the medical treatment and daily physical, speech and occupational therapy as prescribed on the June 7, 2010 Discharge Summary from MMCJ, Simmons' resulting problems . . . would more likely than not have been prevented."  (Id. ¶ 65).  "The failure to provide Simmons with the medical treatment and daily physical, speech and occupational therapy prescribed on the June 7, 2010 Discharge Summary from MMCJ resulted in ataxia, permanent nerve and joint damage, visual impairment,

nystagmus, speech impairment and permanent loss of motor skills." (Id. ¶ 66). Second, Ms. Simmons claims that, on October 7, 2010, Ms. Simmons was transferred from RMC back to LCI where she stayed until she was released on July 31, 2011. (Id. ¶ 44). Upon return to LCI, Defendants Colon, Delp, Dabin, and Rosario "were aware of Simmons' diagnosis of cerebritis and/or Lyme disease with cerebellitis and were aware that Simmons was at substantial risk of serious harm if she did not receive the treatment and therapy recommended on her discharge from MMCJ," but "fail[ed] to carry out the prescribed discharge orders of the doctors at [MMCJ]." (Id. ¶ 67). Defendants Colon, Delp, Dabin, and Rosario "failed or refused to provide Simmons with the treatment and daily physical, speech and occupational therapy prescribed on the June 7, 2010 Discharge Summary from MMCJ." (Id.). "Had Colon, Delp, Dabin, and Rosario provided Simmons with the medical treatment and daily physical, speech and occupational therapy as prescribed on the June 7, 2010 Discharge Summary from MMCJ, Simmons' resulting problems . . . would more likely than not have been prevented." (Id. ¶ 68). "The failure to provide Simmons with the prescribed medical treatment and daily physical, speech and occupational therapy prescribed on the June 7, 2010 Discharge Summary from MMCJ resulted in ataxia, permanent nerve and joint damage, visual impairment, speech impairment and permanent loss of motor skills." (Id. ¶ 69). At this juncture, Plaintiff has sufficiently pled (1) a serious medical need, (2) subjective knowledge on the part of the Individual Defendants of a risk of serious harm, (3) disregard of that risk, (4) by conduct that is more than gross negligence, and that (5) causes the plaintiff's injuries. Mann, 588 F.3d 1306-07; Brown, 387 F.3d at 1351. Like in Kothmann — where the Eleventh Circuit held that plaintiff had alleged facts sufficient to show that the defendant knew that

hormone treatment was medically necessary for plaintiff's GID, yet knowingly refused to provide plaintiff with the treatment — Plaintiff here has alleged sufficient facts that the Individual Defendants knew that treatment and daily physical, speech and occupational therapy was necessary for Plaintiff's Lyme disease, yet knowingly refused to provide Plaintiff with the treatment.  Those allegations are enough to state a claim for deliberate indifference.

Along the same lines, at least at this juncture, the Individual Defendants are not entitled to qualified immunity.  "Qualified immunity insulates government actors, in their individual capacities, from civil lawsuits as long as the challenged discretionary conduct does not violate clearly established federal statutory or constitutional rights." Adams, 61 F.3d at 1542.  Here, Ms. Simmons has pled sufficient facts which, taken as true, demonstrate that the actions of the Individual Defendants violate clearly established law.  At the time of the Individual Defendants' actions, the state of the law was sufficiently clear to put them on notice that refusing to provide Plaintiff with what they knew to be medically necessary treatment was a violation of the Eighth Amendment. Adams, 61 F.3d at 1543 ("Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference."); see Kothmann, 558 F. App'x at 912 ("[B]y 1986, it was well settled in this Circuit that intentionally refusing to provide medically necessary treatment constitutes deliberate indifference and violates the Eighth Amendment.").  In this regard, Defendants' Motions are due to be denied in part — Plaintiff's Amended Complaint states a claim against

Defendants Belizaire, Smith, Colon, Delp, and Rosario[16] for conduct that occurred after Plaintiff received her June 7, 2010 Discharge Summary from MMCJ.

In light of the foregoing, it is

**ORDERED:**

1. Defendants Florida Department of Corrections, Robert A. Delp, Luz Rosario, Witchner Belizaire and Page A. Smith's Motion to Dismiss Plaintiff's Amended Complaint [Doc. 29] is **GRANTED in part and DENIED in part** as follows:

    a. As to Count I, the Motion is **DENIED**;

    b. As to Count II, the Motion is **GRANTED**; and Count II is **DISMISSED**.[17]

---

[16] As previously discussed, Defendant Dabin is due to be dismissed without prejudice for Plaintiff's failure to effectuate service of process within the time prescribed by Federal Rule of Civil Procedure 4(m).

[17] Plaintiff, who is represented by counsel, has not filed a motion for leave to amend her Amended Complaint, and the Court is not required to grant Plaintiff leave sua sponte. See Wagner v. Daewoo Heavy Indus. Am. Corp., 314 F.3d 541, 542 (11th Cir. 2002) (en banc) ("A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."). Rather, Plaintiff requests leave to amend in her Response, see (Response, Doc. 30 at 5), which is improper. Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." (citation and internal quotations omitted)); see Armington v. Dolgencorp, Inc., No. 3:07-CV-1130-J-JRK, 2009 WL 210723, at *2 (M.D. Fla. Jan. 20, 2009) ("It is not appropriate to seek an order for affirmative relief in a response to a motion."); Horne v. Winn Dixie Inc., No. 306CV1068J25MCR, 2006 WL 3841798, at *3 (M.D. Fla. Dec. 11, 2006) ("[A]ll requests for relief from, or action by, the Court must be in the form of a motion."). Additionally, Plaintiff has already amended her initial Complaint once and failed to cure its deficiencies. Nawab v. Unifund CCR Partners, 553 F. App'x 856, 860 (11th Cir. 2013) ("In light of [plaintiff's] prior opportunity to amend his complaint and failure to cure its deficiencies, the district court properly exercised its discretion when it granted summary judgment without sua sponte inviting [plaintiff] to amend his complaint a second time." (internal citation omitted)). Further, even if the request for leave to amend

c. As to Count III, the Motion is **GRANTED in part and DENIED in part** as follows:

    i. The Motion is **GRANTED** to the extent that Plaintiff's Amended Complaint fails to state a claim against Defendants Delp and Rosario for conduct that occurred prior to when Plaintiff was transported to RMC on May 11, 2010; and

    ii. The Motion is **DENIED** to the extent that Plaintiff's Amended Complaint states a claim against Defendants Belizaire, Smith, Delp, and Rosario for conduct that occurred after Plaintiff received her June 7, 2010 Discharge Summary from MMCJ.

2. Defendant Yadirma Colon's Motion to Dismiss Plaintiff's Amended Complaint [Doc. 38], which pertains to Count III of the Amended Complaint, is **GRANTED in part and DENIED in part** as follows:

a. The Motion is **GRANTED** to the extent that Plaintiff's Amended Complaint fails to state a claim against Defendant Colon for conduct that occurred prior to when Plaintiff was transported to RMC on May 11, 2010; and

b. The Motion is **DENIED** to the extent that Plaintiff's Amended Complaint states a claim against Defendant Colon for conduct that

---

had been properly made, Plaintiff failed to satisfy the requirement that a plaintiff seeking leave to amend "must set forth the substance of the proposed amendment or attach a copy of the proposed amended complaint." McGinley v. Fla. Dep't of Highway Safety and Motor Vehicles, 438 F. App'x 754, 757 (11th Cir. 2011) (affirming denial of leave to amend where plaintiff did not set forth the substance of the proposed amendment). For these reasons, the Court declines to grant Plaintiff leave to amend her pleading again.

occurred after Plaintiff received her June 7, 2010 Discharge Summary from MMCJ.

3. Plaintiff's claim against Defendant L. Dabin is **DISMISSED without prejudice** for Plaintiff's failure to properly effectuate service of process within the time prescribed by Federal Rule of Civil Procedure 4(m), and the Clerk of the Court is **DIRECTED** to terminate Defendant L. Dabin from these proceedings.

4. Defendant Lowell Correctional Institution is **DISMISSED without prejudice**, and the Clerk of the Court is **DIRECTED** to terminate Defendant Lowell Correctional Institution from these proceedings.

**DONE** and **ORDERED** in Jacksonville, Florida this 29th day of May, 2015.

BRIAN J. DAVIS
United States District Judge

mg
*Copies furnished to:*

Counsel of Record