**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

STEPHANIE SIMMONS,

       Plaintiff,

vs.                                                               Case No. 5:14-cv-438-Oc-39PRL

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

       Defendants.
_____

<u>**ORDER**</u>

      While Plaintiff Stephanie Simmons was an inmate with the Florida Department of

Corrections, she suffered acute swelling and inflammation of the cerebellum–cerebritis

and cerebellitis, respectively.  Though Plaintiff survived the infection and inflammation of

the brain, she has resultant cerebellar ataxia, which causes impairment in mobility and

speech.  The question presented by this case is whether prison doctors were deliberately

indifferent to her serious medical needs, in violation of the Eighth Amendment of the

United States Constitution, when they failed to provide Plaintiff with the immediate and

intensive physical, occupational and speech therapies ordered by her neurologist.  The

case is before the Court on Defendants' Florida Department of Corrections, Yadirma

Colon, Luz Rosario, Witchner Belizaire and Page A. Smith's Dispositive Motion for Final

Summary Judgment (Doc. 83; Defendants' Motion), and Plaintiff's Dispositive Motion for

Summary Judgment and Motion for Voluntary Dismissal of Counts I and II, (Doc. 87;

Plaintiff's Motion).  The parties have responded in opposition to the respective motions

(see Docs. 95, 96), and the matter is ripe for consideration by the Court.

I.      **Background**

A.      **Plaintiff's Medical History**[1]

At all times relevant to this case, Plaintiff was twenty-one years old (see, e.g., Doc. 83-2 at 2), and was incarcerated for a term of imprisonment at Lowell Correctional Institution ("LCI"), a women's prison facility located in Marion County, Florida, which was operated by the State of Florida, Florida Department of Corrections ("FDOC").  (Doc. 27; Am. Compl. ¶¶ 7, 9 ).[2]  Plaintiff began serving her prison sentence as an inmate at LCI on April 21, 2010.  Id. ¶ 18.  On April 22, 2010, Plaintiff was seen and evaluated by a prison psychologist, at which time she did not report any unusual health problems.  Id. ¶ 20.

On April 27, 2010, Plaintiff was examined by Dr. Robert A. Delp ("Dr. Delp"), a senior physician at LCI.  Am. Compl. ¶¶ 10, 22.  Plaintiff reported to Dr. Delp that she had a skin rash.  Dr. Delp diagnosed Plaintiff with having ringworm, and prescribed antifungal cream for the skin rash.  Id. ¶ 22.  On May 6, 2010, at 6:00 a.m., Plaintiff reported to Health Services at LCI that her legs went number when she stood up, and that she had been vomiting and suffering with diarrhea for three days.  Id. ¶ 23.  Health Services staff observed Plaintiff as she sat on a bench, was unable to walk, and exhibited among other

---

[1]   Unless otherwise noted, the facts recited herein are undisputed based on the citations to the record provided by the parties.  Because this case is before the Court on cross-motions for summary judgment, the Court will, when addressing the merits of either of the parties' motions, view the facts presented in the light most favorable to the party opposing summary judgment.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).  The Court notes that these facts may differ from those ultimately proved at trial.  Id.

[2]   In their Answer, Defendants admit to the chronology of events in the Amended Complaint. (See, e.g. Doc. 67; Answer at 3 ("22. Admitted that this information is recited in Simmons' medical records and otherwise deny this allegation.")).  "A fact admitted by answer is no longer a fact in issue." Hill v. Federal Trade Comm'n, 124 F.2d 104, 106 (5th Cir. 1941); see also Shuler v. Ingram & Assocs., 441 F. App'x 712, 719 (11th Cir. 2011).

symptoms, dark circles under her eyes.  Id.  Plaintiff was referred to the Mental Health Unit at LCI for a medical evaluation.  Am. Compl. ¶ 23.  On that same day, when being evaluated by Mental Health, Plaintiff complained of frequent headaches.  Id. ¶ 24.  (See also Doc. 94; Kern Aff. at 2).

On May 7, 2010, at 9:16 a.m., Simmons reported to Health Services where a skin/rash assessment was performed.  Id. ¶ 25.  Plaintiff reported having a skin rash on both arms since April 23, 2010, and despite using antifungal cream, the rash was growing larger.  Am. Compl. ¶¶ 25, 26.  Additionally, she reported that she had constant headaches, and an earache.  Id. ¶ 26.  The examining Health Services staff found a rash on Plaintiff's legs, arms and right side three to four centimeters in width.  Id. ¶ 25.  Plaintiff was given hydrocortisone cream, referred to a clinician, and directed to return in one week if there was no improvement.  Id. ¶¶ 25, 26.  (See also Doc. 94; Kern Aff. at 2).  An hour later, on May 7, 2010 at 10:10 a.m., Plaintiff was examined by Dr. Yadirma Colón-Carrrasquillo ("Dr. Colon"), Senior Physician at LCI.  Am. Id. ¶¶ 10, 27.  Plaintiff reported to Dr. Colon that she had an earache in her left ear, and that the "ringworm" on her arms and legs was getting bigger, despite the use of antifungal cream.  Id. ¶ 27.  Plaintiff was diagnosed with having ringworm and prescribed cream to apply two times a day for two months.  Id. ¶ 27.

On May 8, 2010, Plaintiff reported to Health Services with a self-declared medical emergency.  Am. Compl. ¶ 28.  Plaintiff complained of vomiting, that her legs were going numb, that she could not walk, and that her headaches had grown worse.  Id.  Plaintiff was observed by Health Services staff of having a slow gait and needing assistance to walk.  Id.  She was referred to "M.D.," was provided Maalox and emetral, and was told to

drink as much water as she could tolerate.  Id.  The next day, on May 9, 2010, Plaintiff reported to Health Services staff that her headache persisted, but that she did not feel nauseous.  An IV was started.  Id. ¶ 29.  Later that same morning, Plaintiff complained to Health Services staff of weakness, headache, and aches all over.  She was assessed at that time as having possible viral symptoms.  Id. ¶ 30.  Plaintiff was offered Tylenol or ibuprofen for her pain, and her treatment plan was "to continue M.D. orders."  Id. ¶ 30.  At 8:30 a.m., the Health Services nurse "spoke to M.D. and was told to continue orders."  Am. Compl. ¶ 31.  That same day, at 4:00 p.m., Plaintiff again remarked to Health Services staff that her head hurt, for which she was offered Tylenol.  Id. ¶ 32.  (See also Doc. 94; Kern Aff. at 2).

On May 10, 2010, at 10:30 a.m., Plaintiff was admitted to the prison infirmary.  Am. Compl. ¶ 33.  At 4:55 p.m., she continued to complain to Health Services staff that her head hurt, and was again given Tylenol.  Id. ¶ 34.  Dr. Colon performed an Inpatient History and Physical on Plaintiff, at which time Plaintiff recounted her weakness and dizziness, vomiting and bilateral leg numbness.  Id. ¶ 35.  Following the examination, Dr. Colon rule[d] out viral syndrome," and gave Plaintiff Phenergan and IV hydration.  Id. ¶ 35. (See also Doc. 94; Kern Aff. at 2).

On May 11, 2010, at 9:00 a.m., Dr. Colon examined Plaintiff again.  Am. Compl. ¶ 36.  Plaintiff was ordered to be transported to Reception Medical Center ("RMC"), a prison medical facility operated by the FDOC in Union County, Florida, "ASAP" to rule out meningitis.  Id. ¶¶ 8, 36.  (See also Doc. 94; Kern Aff. at 2).  Plaintiff was transported from LCI to RMC, and then to Memorial Hospital Jacksonville ("Memorial Hospital"), where she was admitted on May 11, 2010.  Id. ¶ 37; (Doc. 83-2; 05/13/10 Memorial Hospital

Record).  There, her attending physician was Dr. Kasra Nabizadeh.  (Doc. 83-2).

Plaintiff was examined on May 13, 2010, at Memorial Hospital by consulting

infectious disease physician Dr. Hernan Chang.  (Doc. 83-2; 05/13/10 Memorial Hospital

Record).  She reported to Dr. Chang that she had experienced seven days of headaches,

slurred speech, some numbness and weakness in her legs, neck pain, and ataxia.[3]  Id.

Dr. Chang made some preliminary diagnoses including aseptic meningitis, cerebellitis,

and viral encephalitis, and recommended a battery of diagnostic tests.  He concluded that

> The patient has overall guarded prognosis.  We will continue
> with supportive care.  We will continue with Recephin
> [antibiotic] high dose to cover for the possibility of Lyme
> disease.

(Doc. 83-2).  At the hospital, Plaintiff was diagnosed with having ataxia and dizziness.

Am. Compl. ¶ 37.  An MRI of Plaintiff's brain revealed abnormal cerebritis and

cerebellitis.[4]  (Doc. 85-1; K. Nabizadeh Dep. at 12).[5]  Lyme disease was considered based

---

[3]  "Ataxia is '[a]n inability to coordinate muscle activity during voluntary movement, so that
smooth movements occur.  Most often due to disorders of the cerebellum or the posterior columns of
the spinal cord; may involve the limbs, head, or trunk.'"  Scuturo v. Comm'r of Soc. Sec., No.
6:11-CV-498-ORL-GJK, 2012 WL 4017463, at *1 (M.D. Fla. Sept. 12, 2012) (quoting Stedman's Medical
Dictionary, 26th Ed. p. 161 (1995)).  This definition is consistent with the context in which the term
"ataxia" is used within this case.

[4]  The cerebellum is the  part of the brain responsible for one's gait and fine motor activity.  (Doc.
85.1 at 12-13).

[5]  The parties have submitted the following depositions into evidence:

> Deposition of Witchner Belizaire, M.D.  (Doc. 72; Belizaire Dep.)
> Deposition of Yadirma Colon-Carrasquillo, M.D.  (Doc. 73; Colon Dep.)
> Deposition of Corey H. Evans, M.D.  (Doc. 74; Evans Dep.)
> Deposition of John Halpernin, M.D.  (Doc. 75; Halperin Dep.)
> Deposition of Donald C. Kern, M.D.  (Doc. 76; Kern Dep.)
> Deposition of John L. Merritt, M.D.  (Doc. 77; Merritt Dep.)
> Deposition of Arastoo T. Nabizadeh, M.D.  (Doc. 78; Nabizadeh Dep.)
> Deposition of Luz Rosario, M.D.  (Doc. 79; Rosario Dep.)
> Deposition of Stephanie Simmons   (Doc. 80; Simmons Dep.)
> Deposition of Page Smith, M.D.  (Doc. 81; Smith Dep.)

(continued...)

upon a high cytomegalovirus ("CMV") (Lyme) titer score, in Plaintiff's cerebral spinal fluid

("CSF") obtained from a lumbar puncture.  Id. at 13.

While at Memorial Hospital, Plaintiff was first seen by physical therapy on May 20,

2010.

> Her plan included therapy five times per week.  She was also
> seen by occupational and speech therapy.  On 4 June shortly
> before discharge from [Memorial Hospital], PT noted that the
> "patient continues to increase distance" . . . , and speech
> therapy noted "improving speech."

(Doc. 94; Kern Aff. at 3 (citing medical records)).

On June 7, 2010, after treatment at Memorial Hospital, Plaintiff was discharged

back to RMC with a diagnosis of "cerebritis exact etiology unknown and/or Lyme disease

with cerebellitis."  Am. Compl. ¶ 38.  The discharge summary included the following

instructions:

> This patient needs very close observation by infectious
> disease and neurologist.  If Dr. Garna's clinic available to see
> the patient weekly, we will keep the patient at RMC and follow-
> up with Dr. Garna's clinic weekly.  If patient can see Dr. Pella
> weekly, we will continue with weekly follow-up at Dr. Pella's
> clinic.  If the patient cannot see Dr. Garna weekly then she
> needs to be transported weekly at least to see Dr. A.
> Nabizadeh for neurology here at the Department of
> Corrections, Memorial Hospital, Jacksonville.
>
> . . .
>
> This patient's care is not finished by any stretch of
> imagination.  She needs close ID [infectious disease] and

---

[5](...continued)
        Deposition of Robert Delp,  M.D.   (Doc. 84; Delp)
        Deposition of Kasra Nabizadeh, M.D.   (Doc. 85; Nabizadeh Dep.)
        Deposition of Hernan Chang, M.D.   (Doc. 86; Chang Dep.)
        Deposition of Connie Spitzer (f/k/a Connie Bass)   (Doc. 90-1; Bass
        Dep.)

neurology follow up.  She needs close clinician daily follow up.
She needs physical therapy, speech therapy and occupational
therapy daily.

Am. Compl. ¶¶ 38, 39; (see also (Doc. 85-1; K. Nabizadeh Dep. at 23-25)); (Doc. 95-1;

6/6/10 Discharge Summary).  Her Memorial Hospital discharge diagnosis was "cerebritis

["[i]nflammation of the cerebellum"], exact etiology unknown."  (Doc. 85-1; K. Nabizadeh

Dep. at 23).

        Neurologist Dr. Arastoo Nabizadeh was Plaintiff's treating neurologist while she

was at Memorial Hospital.  Dr. Nabizadeh testified that upon Plaintiff's discharge,

Plaintiff's condition was "stable."  (Doc. 78; A. Nabizadeh Dep. at 30).  At that point,

"[m]ost of the medical care would have started from that point on, which is the

rehabilitation, both physical rehabilitation, occupational rehabilitation, speech therapy,

and avoiding complications."  Id. at 31.  The various therapies ordered in the Memorial

Hospital discharge papers were for "improving the patient's functional capabilities to the

point of making [her] capable of living - being independent and functional."  Id. at 32.

After the acute phase of cerebellitis is stablized, "then we try to start neuro rehabilitation

right away to prevent - not only to improve the function, but to prevent the deterioration of

some of it."  "[W]e try to start it very quickly after the patient becomes stable and

continue."  Id. at 33.  According to Dr. A. Nabizadeh, the benefits of the various therapies

can be accomplished in the first six to nine months.  Id. at 33-34.

        Dr. Page Smith was Plaintiff's admitting physician upon Plaintiff's return to RMC on

June 7, 2010, and Dr. Smith  examined Plaintiff and completed an Admission History and

Physical.  Am. Compl. ¶ 40; (Doc. 81; Smith Dep. at 9 and 12)  Dr. Smith was also the

Medical Executive Director at RMC and trained in internal medicine, but was not a

neurology or infectious disease specialist.  Id. at 6, 10; (Doc. 72; Belizaire Dep. at 20).

Dr. Smith said he knew that Plaintiff had come to RMC from Memorial Hospital, that she

had cerebritis, and that "she should have come with records."  (Doc. 81; Smith Dep. at

12).  Dr. Smith said "she did have some records but . . . I can't tell you whether I had the

discharge summary [from Memorial Hospital] or not that particular day."  Id.  Dr. Smith

said "we were told that she had Lyme cerebritis," which he characterized as "an

inflammatory condition that causes problems with the brain due to the lyme . . .

organism."  Id.  He considered it a "serious problem."  Id.  Dr. Smith noted that the

"patient with acute cerebritis needs further treatment.   Patient to follow up with infectious

disease and neurology at Memorial Hospital every two weeks."  Am. Compl. ¶ 40.  (See

Doc. 83-7; Dr. Smith's 6/7-8/10 Notes recommending 2 week follow-up at Memorial

Hospital with Drs. Chang and Nabizadeh and prescribing medication); (Doc. 81; Smith

Dep. at 16).  Dr. Smith said he does not remember if he ordered follow-up care with the

specialists every two weeks "from speaking to someone or [from] an order or something

somewhere."  Id.  Dr. Smith testified that he does not remember seeing the Memorial

Hospital discharge order, but acknowledged that he did know that Plaintiff was sick with

cerebritis.  Id. at 42. Dr. Smith knew that Plaintiff needed follow-up care with a neurologist

and infectious disease specialist, but he assigned different specialists for Plaintiff to see.

Id. at 42.  On June 8, 2010, Dr. Smith assigned Plaintiff's care to a Senior Physician at

RMC, Dr. Witchner Belizaire, which he contends relieved him of responsibility for the care

of Plaintiff.  (Doc. 83-9; Dr. Smith 6/8/10 Note); (Doc. 81; Smith Dep. at 32-33).  Dr. Smith

said he had no knowledge as to whether Plaintiff ever received physical, occupational or

speech therapy, because Plaintiff's "attending physician" would have been responsible for

Plaintiff's care and ensuring that Plaintiff received the required therapies.  (Doc. 81; Smith Dep. at 32, 42).  Dr. Smith said that if a particular therapy was not available at RMS, then "[w]e would have sent her to Memorial as an outpatient to get it."  Id. at 41.

On June 8, 2010, Dr. Witchner Belizaire, performed an Admission History and Physical on Plaintiff.  Am. Compl. ¶ 41; (Doc. 83-10; Dr. Belizaire 6/8/10 Note).  He was a primary care doctor at RMC, practicing internal medicine.  (Doc. 72; Belizaire Dep. at 8).  At that time, Plaintiff complained of a headache.  Am. Compl. ¶ 41.  Dr. Belizaire noted that Plaintiff; had just come from Memorial Hospital, where she was diagnosed and partially treated for cerebritis with unknown etiology; needed to be seen by neurology and infectious diseases specialists at least once per week; spoke very slowly and with very slurred speech; and walked with difficulty and needed assistance.  Am. Compl. ¶ 41; (Doc. 83-10; Dr. Belizaire 6/8/10 Note); (Doc. 72; Belizaire Dep. at 15).  Dr. Belizaire wrote that Plaintiff "will continue with IV Recephin, Ganciclovir, Avelox for 7 days," that he planned to consult physical therapy and speech therapy, as per the Memorial Hospital discharge summary, and that he would determine whether occupational therapy existed for Plaintiff at RMC.  Am. Compl. ¶ 41; (Doc. 83-10; Dr. Belizaire 6/8/10 Note); (see also Doc. 72; Belizaire Dep. at 17 ("we continued with her care.").  Dr. Belizaire was Plaintiff's physician from June 8, 2010 until July 2, 2010, and then again from July 30, 2010 until her discharge back to LCI on October 7, 2010.  (See Doc. 83-8; Evans Report ¶¶ 7, 8); Am. Compl. ¶ 42; (Doc. 95 at 7).[6]  On June 29, 2010, Dr. Belizaire wrote an order for Plaintiff to receive neuro physical therapy three times a week for three weeks.  (Doc. 83-

---

[6]  It appears that Plaintiff's care was assigned to Dr. Grosch on July 2, 2010.  Dr. Groshch was a new doctor starting at RMC and "[h]e needed patients."  (Doc. 72; Belaizaire Dep. at 38-39).  Plaintiff's care was assigned back to Dr. Belizaire on July 30, 2010.  Id. at 43.

8; Evans Report ¶ 9).[7]  Dr. Belizaire testified that Dr. Smith had a role in the care of

Plaintiff to the extent that "we always had rounds.  We discussed all the cases every

week, all the patients there."  (Doc. 72; Belizaire Dep. at 20).  As the Medical Executive

Director at RMS, Dr. Smith would administratively approve Dr. Belizaire's consultation

requests.  (Doc. 96-7; Evans Report ¶ 6).

Plaintiff's first follow-up neurology and infectious disease appointments at

Memorial Hospital were on July 22, 2010.  Drs. Smith and Belizaire could not explain why

the follow-up appointments with specialists at Memorial Hospital took six weeks to occur.

(Doc. 81; Smith Dep. at 24-25); (Doc. 72; Belizaire Dep. at 21).  On July 22, 2010,

Plaintiff complained of persistent ataxia and nystagmus–involuntary movement of the

eye.  Am. Compl. ¶ 43.   Dr. K. Nabizadeh was the attending physician, and Plaintiff was

seen by infectious disease specialist Dr. Chang.  (Doc. 86; Chang Dep. at 52); (Doc. 78;

A. Nabizadeh Dep. at 35).  Plaintiff was not seen by the neurologist Dr. A. Nabizadeh

during this visit.  (Doc. 78; A. Nabizadeh Dep. at 36).  According to the medical records

reflecting the visit, the examiner's impression was:

> 1. Lyme disease with neurological involvement.  The patient is
> still having some signs of cerebellitis and cerebritis.  The
> patient is not able to walk well.  2. History of mycoplasma IGM
> positive.  The patient is status post treatment with antibiotics.
> 3. Nystagmus.  Appears somewhat improved but persisting.
> 4. Ataxia.  Needs continued physical therapy and will evaluate
> as to whether or not there is improvement of her inflammation
> in the cerebellum, most particularly in the vermis.

Am. Compl. ¶ 43.  Plaintiff was admitted to Memorial Hospital for a two day evaluation,

---

[7]   Defendants' Expert Dr. Corey Evans writes in his Report that "additional physical therapy orders were written on July 24, and 29, August 5, 12 and 17." (Doc. 96-7; Evans Report ¶ 10). Dr. Evans does not cite to any documentary evidence of these orders, though they may be somewhere in the voluminous record of this case.  Additionally, it is not clear who wrote the orders.

returning to RMC on July 24, 2010. (Doc. 94; Kern Aff. at 3).  A repeat MRI performed at Memorial Hospital in July 2010 showed that the inflammation of Plaintiff's brain had "significantly improved as compared to the previous examination from May 18, 2010." (Doc. 94; Kern Aff. at 3) (citing medical records); (Doc. 76; Kern Dep. at 50).

Upon her return to RMC, a consult request for physical therapy dated July 29, 2010 was marked "urgent."  "However, Doctors Progress Notes on 27 July, 30 July, and 2 August indicate physical therapy was still pending."  (Doc. 94; Kern Aff. at 4 (citing medical records)).  A speech therapy evaluation did occur on July 29, 2010, "and then once a week for several weeks."  (Doc. 94; Kern Aff. at 4).

On August 4, 2010, Plaintiff was seen by Dr. Pella, an infectious disease specialist.  (See Doc. 76; Kern Dep. at 65).  And on August 5, 2010, Plaintiff was examined by Dr. Gama, a neurologist.  (See Doc. 76; Kern Dep. at 65).  The neurology consultant

> noted that recent imaging showed 'there was still evidence of cerebritis[,]' [and that Plaintiff] was unable to walk and complained of double vision.  Recommendations included physical therapy for gait training, nursing care, and return to clinic in two to four weeks.

(Doc. 94; Kern Aff. at 4 (citing medical records)).

Plaintiff had physical therapy appointments on June 24, August 24, 26, 27, and September 1, 3, 8, 13, 14, 15, and 20, 2010.  (Doc. 83-8; Evans Report ¶ 10); (see Doc. 76; Kern Dep. at 65-66).  The first appointment on June 24, was a consultation, during which three weeks of physical therapy, three times a week, was authorized.  (Doc. 90-1; Spitzer Dep. at 15, 34).  Plaintiff had nine physical therapy sessions over the next three weeks, between August 24 and September 15, 2010.  (Doc. 90-1; Spitzer Dep. at 23-34).

The September 20, 2010 appointment was a discharge note and did not involve any therapy.  (See Doc. 90-2 at 27; PT Discharge Note).  A non-defendant healthcare provider, Dr. Rosmery Simo, discharged Plaintiff from physical therapy on September 30, 2010, because of Plaintiff's poor prognosis.  (Doc. 83-8; Evans Report ¶ 10);(Doc. 83-11; Dr. Simo Note); (See Doc. 76; Kern Dep. at 66).  Dr. Belizaire testified that he does not know why, other than a physical therapy evaluation, Plaintiff did not receive physical therapy until August 24, 2010, eleven weeks after the Memorial Hospital order for daily therapy.  (Doc. 72; Belizaire Dep. at 46).  During the nine physical therapy sessions, the therapist observed that Plaintiff "leans to the right side in sitting and with gait;" walking "a little bit" using a walker; sitting up in a chair; "Inmate requires assistance to keep from falling . . . to the right with gait."  (Doc. 90-1; Spitzer Dep. at 24-29, 31, 32).  Plaintiff told the therapist that "I can feed myself but I make a mess[,]" that she "fell going to the bathroom . . ."; and that she was scared to walk to the bathroom because she did not want to fall.  Id. at 28, 29-30; (see also Doc. 94; Kern Aff. at 4 (noting that on September 7, 2010 "the patient fell in the bathroom and sustained a black eye and a laceration to the back of her head." (citing medical records)).  The therapist testified that Plaintiff "was practicing."  (Doc. 90-1; Spitzer Dep. at 28)  By September 20, 2010, the last of Plaintiff's "approved visits," the therapist wrote:

> Inmate has completed all approved PT visits.  Inmate is able to feed herself and dress herself with minimal assist, but is unable to sit to stand or any transfer from independently and safely.  Inmate requires moderate assist times two for gait with standard walker secondary to inmate experiencing loss of balance to the right side.  Goals have not been met . . .

(Doc. 90-1; Spitzer Dep. at 33-34).  Plaintiff did not receive any occupational therapy

during the nine physical therapy sessions.  (Doc. 90-1; Spitzer Dep. at 24, 26-32); (Doc. 90-2; Physical Therapy Notes).

Plaintiff received speech therapy on June 17, 24, July 1, 8, 29, August 5, 12, 19, 26, September 2, 9, 16, 23, 30, and October 7, 14, and 21, 2010.  (Doc. 83-8; Evans Report ¶ 11); (see Doc. 76; Kern Dep. at 65).  Plaintiff declined transport to speech therapy appointments on November 4, December 9, 16, 30, 2010, and January 5, 13, and 19, 2011.  (Doc. 83-8; Evans Report ¶ 11); (Doc. 76; Kern Dep. at 74).  In January, she declined speech therapy because she said that she did not feel good.  (Doc. 73; Colon Dep. at 28).

The sequence of events in the fall of 2010 are not entirely clear from the parties' citation to the record.  On September 8, 2010, Plaintiff was seen by consulting infectious disease specialist, Dr. Chang.  (Doc. 95-3 at 3; Chang Note).  Dr. Chang recommended "gait training to continue" and "PT/OT to continue."  (Doc. 95-3 at 3; Chang Note).

On October 7, 2010, Plaintiff was transferred from RMC back to LCI, where she was held until she was released on July 31, 2011.  Am. Compl. ¶ 44.  At LCI, an inmate is not assigned a specific treating physician.  Rather, therapy could have been ordered by any of the four or five doctors on the LCI medical staff that may have seen her, depending on availability.  (Doc. 73; Colon Dep. at 8-9, 34).  Another physical therapy plan of care was recommended on November 4, 2010, that included therapy two times a week for four weeks "for neuro rehab of upper extremity and lower extremity, coordination, balance training, transfer training and gait training."  (Doc. 90-1; Spitzer Dep. at 36).

Dr. Luz Rosario's first contact with Plaintiff was at LCI on December 8, 2010,

where, as LCI Chief Medical Officer, she approved requests for infectious disease and neurology follow-ups made by the specialists two months earlier, on October 8, 2010. (Doc. 79; Rosario Dep. at 35-41).  Dr. Rosario worked in an administrative capacity and reviewed and signed medical orders.  (Doc. 83-8; Evans Report ¶ 15); (Doc. 79; Rosario Dep. at 9).  She did not treat Plaintiff.  (Doc. 79; Rosario Dep. at 9).  Dr. Rosario did not know why it took two months to approve the consult requests.  Id. at 36-37.  Plaintiff refused to go to the infectious disease and neurology follow-up appointments which were scheduled for December 29, 2010, and on February 25, 2011.  Id. at 37-38, 40-41.

On January 19, 2011, Dr. Colon made an entry upon Plaintiff's chart in response to Plaintiff's request to participate in a work-release program.  Dr. Colon declined to recommend Plaintiff for the program because she was not capable of working.  "She was not in healthy conditions . . . . She was in rehabilitation after Lyme disease, and she was not independent."  (Doc. 73; Colon Dep. at 26-27).  Dr. Colon did not know whether Plaintiff was actually receiving therapy at that time.  Id. at 27.  Plaintiff's neurological deficits did not improve through her release from prison in July 2011.  (Doc. 76; Kern Dep. at 50).  On June 8, 2011, infectious disease consultant Dr. Chang examined Plaintiff.  Among his recommendations was one in which he recommended that Plaintiff continue physical therapy.  (Doc. 95-3 at 5).  Upon Plaintiff's release from prison on July 31, 2011, Dr. Colon recommended that Plaintiff follow-up with her primary care physician.  (Doc. 73; Colon Dep. at 36).

### B.  Procedural Posture

Plaintiff initiated this action by filing a three-count Complaint in the state Circuit Court for the Fifth Judicial Circuit, in and for Marion County, Florida, on April 21, 2014.

(Doc. 2; Complaint); (Doc. 1-1; State Court Docket).  Plaintiff named as Defendants, the FDOC, LCI, six physicians, including Drs. Smith, Belizaire, Rosario and Colon.  Plaintiff alleged state law negligence (premises liability) against FDOC and LCI; negligent training and supervision against FDOC and LCI; and violation of Plaintiff's rights of under the Eighth Amendment of the Constitution against the Defendant doctors.  (Doc. 2).  On August 4, 2014, Defendants removed the action to this Court based upon federal question jurisdiction.  28 U.S.C. § 1331.  (Doc. 1; Notice of Removal).[8]

This case is currently before the Court on Plaintiff's three-count Amended Complaint, filed on September 25, 2015, which is the operative complaint.  (Doc. 27).  In the Amended Complaint, Plaintiff alleged that FDOC was liable for negligence for failure to remove ticks from the premises of LCI and failing to warn Plaintiff of the danger, which resulted in her injury (Count I); and for negligent training and supervision of its physicians and nursing staff "to recognize and treat health conditions such as Lyme disease and other viral infections in inmates."  (Count II).  In Count III, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleged that Drs. Smith, Belizaire, Rosario, Colon, Robert A. Delp, and L. Dabin violated Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment, based upon the doctors' alleged deliberate indifference to Plaintiff's serious medical needs, starting on April 27, 2010, and continuing through July 31, 2011 when Plaintiff was released from her incarceration at LCI.  (Count III).  Defendants filed motions to dismiss the Amended Complaint.  (See Docs. 29, 30).

In its Order dated May 29, 2015, the Court granted in part and denied in part the

---

[8]   The FDOC waived its Eleventh Amendment Immunity by joining in the Defendants' petition to remove the case to federal court.  (See Doc. 60 (citing Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 122 S.Ct. 164 (2002)).

Defendants' motions to dismiss the Amended Complaint.  (Doc. 42; 05/29/15 Order).

Specifically, the Court denied the FDOC's motion as to Court I, and granted the FDOC's

motion as to Count II.  Accordingly, Count II was dismissed.  (05/29/15 Order at 33).  As

to Count III, the Court parsed through the allegations of the Complaint and ruled that the

Defendant doctors' motions were granted to the extent that Plaintiff's Amended

Complaint failed to state a claim against Defendants Delp, Rosario and Colon for conduct

that occurred prior to when Plaintiff was transported to RMC on May 11, 2010.  The Court

denied the motions to the extent that Plaintiff's Amended Complaint stated a claim

against Defendants Belizaire, Smith, Delp, Rosario, and Colon for conduct that occurred

after Plaintiff received her June 7, 2010 Discharge Summary from Memorial Hospital.

05/29/15 Order at 34-35.  Additionally, the Court dismissed without prejudice Plaintiff's

claim against Defendant L. Dabin, for failure to properly effect service of process within

the time prescribed by Rule 4(m), Federal Rules of Civil Procedure (Rule(s)), and LCI, as

duplicative of Plaintiff's claim against FDOC.  Id. at 35.  Thus, in accordance with the

Court's 05/29/15 Order, the case has proceeded on Count I alleging premises liability

against FDOC, and on Count III, alleging a section 1983 claim against the remaining

Defendant physicians, but only as to conduct that occurred after Plaintiff's June 7, 2010

discharge from Memorial Hospital.

    In her Motion for Summary Judgment, Plaintiff moves "for voluntary dismissal of

Counts I and II" of her Amended Complaint, citing to Rule 41.  (Doc. 87; Plaintiff's Motion

at 1).  As set forth above, Count II was dismissed by the Court.  (See Doc. 42; 05/29/15

Order).  As to Count I, Plaintiff is not permitted to unilaterally dismiss a claim at this

juncture without a Court order.  Fed. R. Civ. P. 41(a)(1)(A).  The Court determines that

Plaintiff has abandoned Count I.  See generally Ekokotu v. Fed. Exp. Corp., 523 F. App'x 629, 632 (11th Cir. 2013) (finding that plaintiff abandoned his Title VII national origin discrimination claim against employer "because he not only failed to argue them in response to [the employer's] motion for summary judgment, but he explicitly and unequivocally disavowed them . . . .");[9] Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009) (failure to respond to an argument raised in a motion for summary judgment results in a waiver or abandonment of the issue) (internal citation omitted).  Accordingly, the FDOC's Motion for Summary Judgment is due to be granted to the extent that its seeks summary judgment as to Count I.

Additionally, Defendant Robert L. Delp passed away on June 13, 2015, and on July 1, 2015, Defendants' counsel file a Statement Noting a Party's Death.  (Doc. 49). Despite being alerted to the requirements of Rule 25 (see Doc. 57), Plaintiff has not filed a motion for substitution of the proper party within the 90 days after service of a statement noting the death.  See Fed. R. Civ. P. 25.  As such, Dr. Delp is due to be dismissed from this action.

Plaintiff's remaining claim in Count III relates to the medical care and the amount and intensity of the physical therapy, occupational therapy, and speech therapy Plaintiff received in two specific periods of time: from June 7, 2010 until October 7, 2010 while she was incarcerated at RMC under the care of Defendants Drs. Smith and Belizaire; and from October 7, 2010 until July 31, 2011, while she was incarcerated at LCI under the

---

[9] "Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam).  See generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

care of Defendants Drs. Rosario and Colon.

**C.    Expert Opinions**

**1.    Plaintiff's Expert Dr. John L. Merritt.**

In his report, dated September 8, 2015, Plaintiff's expert, Dr. John L. Merritt

reports that Plaintiff

> currently has poor balance, ataxia of gait and speech and
> uses a manual wheelchair for mobility, which she is unable to
> propel independently.  She has frequent falls and has
> developing neurogenic kyphoscoliosis, with poor wheelchair
> balance.  She is not receiving physical, occupational or
> speech therapy currently.  She is dependent in mobility and
> activities of daily living and has ongoing impaired speech,
> spine pain, weakness, anxiety and depression.

(Doc. 83-3; Merritt Report at 4).  He described her condition as being

> a persistent disability secondary to an acute cerebritis with
> cerebellar ataxia, and now resultant chronic impairments of
> mobility and activities of daily living as a consequent of Lyme
> disease.

Id. at 3.  Upon review of the file, Dr. Merritt concludes:

> It is my opinion, to a reasonable degree of medical certainty,
> that Ms. Simmons has significant permanent disabilities and
> impairments . . . as a result of her Lyme disease related
> cerebritis ad cerebellar disease, and that she did not receive
> the appropriate intensive physical occupational and speech
> therapy during an essential window of time that would have
> minimized her neurological impairments, and provided her the
> best opportunity for functional gains.

(Doc. 83-3; Merritt Report).[10]

On cross examination, Dr. Merritt acknowledged that the proper treatment of acute

---

[10]    Defendants challenged the admissibility of Dr. Merritt's testimony, filing a Motion to
Exclude his Testimony, pursuant to Rule 702, Federal Rules of Evidence, and Daubert v. Merrill Dow
Pharmss., Inc., 509 U.S. 579 (1993).  (Doc. 82).  The Court denied Defendants' Daubert motion,
having determined that Dr. Merritt's testimony is admissible.  See (Doc. 104).

cerebritis, a deadly inflammation and swelling of the brain, is through medication.  (Doc. 77; Merritt Dep. at 47-48)).  During this two to three week "superacute" phase, physical therapies are not appropriate, because the brain needs to rest.  Id. at 48.

However, Dr. Merritt testified that physical therapy does treat brain inflammation, following the initial phase of treatment of removing the bacterial or viral agents causing the inflammation and reducing the swelling with medications, and promotes the healing of cells.  (Doc. 77; Merritt Dep. at 44-45).

> [T]he following phase is actually the reestablishment of the connections that go on through the motor system and the sensory system and the complex balance system and, as we know, sort of everything connects to everything else in there, and the actual physical therapy . . . helps with the process of the third session of reducing edema because it provides the firing of neurons in a sequence and then that helps stimulate electrical currents going down through that particular sequence which then enhances neuro reconnections, reconnections between the billions of axons and the trillions of dendrites that are all connecting, and it's a very sophisticated computer, it has to be retrained, and the physical therapy does one part of that, which is the trunk and the lower extremities generally.
>
> The occupational therapy does the upper part of that, so the upper trunk, shoulders, the hands, as well as working on practical things like activities of daily living, and the speech therapy is very important because it enhances not only retraining and speech and the motor functions of the pallet and the lips and the throat in forming the speech, but also speech therapy also involves cognitive retraining.
>
> They provide things to help improve on losses in memory and deficits and word finding, so that therapy is actually designed to enhance . . . the new connections to have to make a place for the lost old connections and to enhance the repair of the lost old connections.
>
> . . .

19

> Most won't get back to where they were, but you hope you'll get back to maybe 75 percent or 80 or 90 percent until the person is able to function in the community and the therapy also involves practical things, particularly [occupational therapy], because they work on activities of daily living, brushing your teeth, feeding, combing you hair, getting your blouse, bra and pants on, what we call the activities of daily living.  They work on functional things as well as retraining.

(Doc. 77; Merritt Dep. at 45-47); see also id. at 68 (opining that aggressive physical therapy would have reduced Plaintiff's ataxia "maybe 50 to 70 percent" by maximizing and restoring lost functions and by providing compensatory techniques and procedures to compensate for what is not restored).  Further amplifying his opinion. Dr. Merritt testified that

> had [Plaintiff] received intensive therapy during that window of time, the first year, especially in the first six months, she would have regained between 70 and 80 percent of her baseline function, which would be enough for her to be able to ambulate with a walking . . . stick . . . , being able to dress herself, being able to bathe herself, being able to perform her activities of daily living, with some adaptive equipment, and would have been able to use a wheelchair, a manual wheelchair, for a long distance instead of having to have a power chair for a long distance . . . and . . . she may have been able to go on to some voc-rehab, and finishing up her education and get back into some employment.
>
> In addition to that, I think that she could have improved her speech probably in the same range of 75 percent . . . .
>
> I think that by improving her mobility there, she would have been able to restore regular bladder function so she wouldn't have to wear a diaper at night.

Id.

According to Dr. Merritt, coordination exercises, which is what Plaintiff needed, should be done every single day, and even twice a day, "because it requires . . .

20

hundreds and hundreds of repetitions of the same thing."  (Doc. 77; Merritt Dep. at 69-70).  "[T]he treatment is not completed until the person has done the things to rehabilitate the damage."  Id. at 44.  He opined that Plaintiff should have received at least five days a week of physical, occupational and speech therapy during the six months following her discharge from Memorial Hospital, id. at 70-71, and that it was incumbent upon Drs. Smith and Belizaire to have referred Plaintiff to an acute rehabilitation hospital.  Id. at 71.  In response to questioning, Dr. Merritt said that there is a possibility that physical therapy may include some upper extremity work.  (Doc. 77; Merritt Dep. at 89).

Dr. Merritt agreed that acute cerebritis "[k]ills the brain cells," by reducing blood flow into the area.  (Doc. 77; Merritt Dep. at 47-48).  Based upon imagining in June 2012, Dr. Merritt opined that Plaintiff has both cerebral cortex (a loss of cells in the cortex) and vermis atrophy (loss of neurons, axons and microglia in the cerebellum of the brain).  Id. at 74-76.  Dr. Merritt agreed that no amount of speech, occupational or physical therapy would reverse vermis atrophy or cerebral cortex atrophy.  Id. at 75-76.  On cross examination, Dr. Merritt agreed that the amount of physical therapy appropriate for Plaintiff was a "medical judgment."  Id. at 60.

## 2.   Plaintiff's Expert Dr. Donald C. Kern

Dr. Donald C. Kern, is an internal medicine doctor with sub-specialties in epidemiology and geriatrics.  He has held medical director positions, and has extensive experience in Correctional Health Services.  (See Doc. 94-1; Kern Curriculum Vitae).  Defendants do not challenge Dr. Kern's expertise.  Dr. Kern opined that defendant Drs. Rosario, Belizaire and Smith were deliberately indifferent to the medical needs of Plaintiff while under their care, because Plaintiff "did not receive important care that was ordered"

by consulting doctors.  (Doc. 94; Kern Aff. at 3, 6); (see also Doc. 94-1 at 8-9; Kern

Report).  Dr. Kern summarizes the facts as follows:

> Stephanie Simmons arrived at [LCI] a healthy young woman.  Shortly thereafter, she developed a devastating infection that caused swelling and inflamation of her brain.  This in turn affected her ability to speak and control her movements including her ability to walk and perform simple activities of daily living.  She was hospitalized for weeks and was showing progress with intensive therapy.
>
> At discharge from [Memorial Hospital], a one week follow up was clinically required.  However, the follow up appointment was made for over six weeks later.  Physical therapy and speech therapy was also delayed, and there is no indication that any occupational therapy was provided, despite repeated exhortations from the consulting specialists.
>
> When she finally had her follow up appointment with her treating neurologist, the concern at her lack of further progress triggered a readmission to the hospital to determine if her cerebritis had worsened.  In actuality, the MRI showed that the brain injury itself was significantly improved.  To a reasonable degree of medical certainty, her lack of continued improvement was due to the interruption of the therapies she was receiving in the hospital.
>
> The best chance to achieve improvement in function after brain injury is in the first several months after the event.  By the time she started to receive some consistent physical and speech therapy at RMC, about two months had passed since discharge from the hospital.  After several weeks, physical therapy apparently stopped despite continued recommendations from her treating specialists, with no indication from the staff at RMC or [LCI] that they had any clinical disagreement with the specialists.  Because of this, Ms. Simmons continued to experience severe functional impairments that put her at risk of falling with significant injury.

(Doc. 94; Kern Aff. at 5-6); (Doc. 94-1 at 8-9; Kern Report).

Dr. Kern said that as of July, 2010, Plaintiff's cerebritis was being treated by

intravenous antibiotics and numerous medications.  (Doc. 76; Kern Dep. at 55-56).  He

testified that "[t]he key issue was the therapies. . . . [T]hey kept saying the therapies are needed and the therapies are not being done.  There wasn't the sense of urgency to get those therapies done."  Id. at 94-95.  Dr. Kern testified that "these therapies have the greatest potential the sooner they are implemented.  That's why while she was at the hospital they were already implementing them and doing them intensively and why the discharge summary made such a point and the consultants kept making a point about how important these therapies were because the sooner they were done the better the chance that the patient will benefit."  d. at 79-80.  While Dr. Kern could not say with a degree of medical certainty that the delay in obtaining Plaintiff an infectious disease consult and a neurologic consult impacted Plaintiff's cerebellitis or cerebritis or that the early treatment would have been changed by earlier consults, he said that the initial delay had the trickle-down effect of delaying the physical, occupational and speech therapies, which impacted Plaintiff adversely.  Id. at 95-97.  He testified that, in his opinion, and with a degree of medical certainty, had Plaintiff received additional physical therapy while still at RMC, and then after she was returned to LCI, that her condition would have improved.  Id. at 87-89.  He takes issue with the timing and intensity of the therapy sessions in light of the strong recommendations of the hospital-based consulting specialists.  Id. at 70.

### 3.    **Defendants' Expert Dr. Corey Evans**

Defendant's expert, Dr. Corey Evans, is board certified in Family Medicine with added qualifications in Sports Medicine and Geriatric Medicine.  He currently practices medicine as a family physician and wound care practitioner.  (Doc. 83-8 at 2; Evans Report).  In Dr. Evans' opinion, Drs. Smith, Belizaire, Rosario and Colon "met the prevailing professional standard of care in the diagnosis, care and treatment" of Plaintiff,

and that "nothing they did or failed to do caused injury or harm" to Plaintiff.  Id. ¶ 1.

Specifically, Dr. Evans opines that upon Plaintiff's discharge from Memorial Hospital and

return to RMC,

> Dr. Smith and Dr. Belizaire adequately, appropriately and
> timely addressed all of [Plaintiff's] specific medical needs, to
> include her serious medical condition of cerebellitis and its
> sequallae.  Furthermore, Dr. Smith and Dr. Belizaire follow
> [Plaintiff's] hospital discharge orders, which included writing
> orders for prescription medication, physical and speech
> therapy and specialty follow-up.  Dr. Smith and Dr. Belizaire
> did not disregard, ignore, deny, delay or refuse to provide any
> medical care to [Plaintiff].  Dr. Smith and Dr. Belizaire were not
> deliberately indifferent to [Plaintiff's] serious medical condition.

(Doc. 83-8; Evans Report ¶ 5); see also id. ¶ 13 (stating that while Plaintiff was admitted

to RMC, Drs. Smith and Belizaire "continued to provide [Plaintiff] with all necessary

medical care for her acute cerebellitis appropriately, adequately and timely.").  Dr. Evans

states that Drs. Smith and Belizaire were not deliberately indifferent with regard to the

various therapies because they ordered the therapies; "they were expecting it."  With

regard to whether Plaintiff ever actually received the therapy ordered, Dr. Evans

responded: "[T]hey can't control that but they were ordering it, expecting it," and they

noted that they were still waiting for it.  (Doc. 74; Evans Dep. at 34).  Additionally, Dr.

Evans states that the Defendant doctors at LCI, Drs. Rosario and Colon, "adopted the

orders written at [RMC]," and neither disregarded, delayed, or refused to provide Plaintiff

with care, and as such, were not "deliberately indifferent to [Plaintiff's] serious medical

condition of cerebellitis/cerebritis."  Id. ¶ 14.  Dr. Evans observed that Dr. Rosario

"provided [Plaintiff] no hands on care," and that she "timely reviewed and signed needed

orders written."  Id. ¶ 15.  Dr. Evans concludes that the physical and speech therapies

received by Plaintiff "were appropriate as was the providers' medical judgment to

discharge [Plaintiff] from physical therapy on September 30."  (Doc. 83-8; Evans Report ¶

12)

###     4.     Defendants' Expert Dr. John Halperin

Dr. John Halperin is board certified in internal medicine and neurology. Upon

review of Plaintiff's records, Dr. Halperin observed that Plaintiff was already suffering

from cerebellitis at the time she was admitted to Memorial Hospital on May 11, 2010.[11]

He reached the following conclusions after reviewing Plaintiff's records:

> Due to the inflammatory process which damages the
> cerebellum, [Plaintiff] developed irreversible cerebellar
> atrophy.  This injury is the cause of [Plaintiff's] neurological
> deficits which required [Plaintiff] to use a wheelchair/walker
> beginning in May 2010 and it is this injury that continues to
> cause [Plaintiff's] neurological deficits, including but not limited
> to her reliance on a wheelchair/walker.

> That due to the severity of the cerebellar damage,
> within a reasonable degree of medical probability, the
> sequallae of [Plaintiff's] cerebellitis (to include slurred speech,
> ataxia, and nystagmus) will not resolve.

> Although the recommendation for physical therapy and
> speech therapy was based on appropriate medical judgment,
> such therapies, even if aggressively provided, would not return
> [Plaintiff] to her prior baseline nor would such therapies
> resolve or in any way improve her brain atrophy and it is the
> brain damage that is the cause of her neurological deficits.

> [Plaintiff's] past and current neurological signs,
> symptoms and ultimate disabilities are as a result of the
> certain damage and deterioration of her brain secondary to the

---

[11]   While not pertinent to the issues pending before the Court at this juncture, Dr. Halperin
opined that Plaintif's mycoplasma infection that triggered inflammation and damage to Plaintiff's
cerebellum ("cerebellitis") was not caused by nor did it arise from a tick bite.  (Doc. 83-14 at 2; Halerpin
Report).  "As part of this inflammation, a broad range of antibodies was present in the spinal fluid,
causing a cross reaction and false positive Lyme test in the spinal fluid."  Id.

> sequallae of her mycoplasma infection, and are not the result
> of any actions or inactions of Defendants . . . .

(Doc. 83-14 at 3; Halperin Report).   Dr Halperin reiterated his opinion during his

deposition:

> I think the simple fact here is that very early in the course of
> the inflammation that the dye was cast in terms of her having
> severe cerebellar damage.  That's something no therapy is
> going to change and that's what she is left with . . . .  What you
> will see over time is some very, very slow improvement
> relative to where they were at their worst and that's what the
> therapies can tweak at the margins, take advantage of and her
> five percent here, ten percent there.  The fact is that with the
> amount of cerebellar damage she suffered it is highly unlikely
> she will ever be fully ambulatory, have a high level of
> coordination of the hands and feet and always have these
> abnormal eye movements that make it difficult for her to focus
> visually.  That's what she is left with, no matter how hard we
> try to change that.
>
>                                . . .
>
> [The five to ten percent figure is] a guesstimate.
>
>                                . . .
>
> With this degree of cerebellum damage you are
> probably not going to see a lot more than that.

(Doc. 75; Halperin Dep. at 25-26).

When questioned whether nine physical therapy visits constituted an appropriate

amount of care for a person with Plaintiff's condition, Defendant's expert Dr. Halperin

responded "that that's a matter of judgment," but that "I don't think she was served if she

had only nine sessions."  (Doc. 75; Halperin Dep. at 19-20).  Dr. Halperin said that

placement in an acute rehabilitation facility "would have been an ideal aggressive

approach."  Id. at 20.  He agreed that "the main thing you are trying to do in this first

period after such an acute illness is to keep people mobilized to prevent secondary

complications and to get them more active and more able to function." Id. at 19. "I don't think there is a clear science that supports one particular window of time. I think that some of the experts have said recovery is more rapid early on so that's when you would like to work most with someone." Id. at 21. He acknowledged that while in his opinion Plaintiff's ataxia will not resolve, the "best" treatment "is physical therapy for the legs, occupational therapy for the hands, gives you some marginal improvement but just marginal. . . . Same thing [for slurred speech], a speech therapy may offer a little bit. Most are healed by time rather than the therapies we prescribe." Id. at 16. "[I]t would be hard to know if that would have given her a five percent better recovery." Id. He agreed that the specialists' discharge order requiring daily physical, occupational, and speech therapy was "perfectly reasonable." Id. at 22. Dr. Halperin opined that he did not think that the physical therapy schedule "had a long term impact on her current state," and that someone with a severely damaged cerebellum has a "very limited prospect." Id. at 20-21.

## II.   <u>Standard of Review</u>

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Rule 56(c)(1)(A).[12]  The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).  "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

[12]     Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions."  Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.  The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

proof at trial,' there exist no genuine issues of material fact." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## III.   Defendants' Motion for Summary Judgment (Doc. 83)

### A.   Applicable Law

"In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under color of state law." Griffin v. City of Opa–Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).  The Eighth Amendment to the United States Constitution governs the conditions under which convicted prisoners are confined and the treatment they receive in prison.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  It is applicable to the states through the Due Process Clause of the Fourteenth Amendment.  Thomas v. Bryant, 614 F.3d 1288, 1303 (11th Cir. 2010).  The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII.  Three kinds of Eighth Amendment claims arise in the prison context: challenges to specific conditions of confinement, the excessive use of force, and deliberate indifference to a prisoner's serious medical needs. Thomas, 614 F.3d at 1303-04.

The Supreme Court has interpreted the Eighth Amendment to include "deliberate indifference to serious medical needs of prisoners."  Estelle v. Gamble, 429 U.S. 97, 104, (1976).  To prevail on a claim for deliberate indifference, a plaintiff must show "(1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009).  The analysis contains both an objective and a

29

subjective component.  Gilmore v. Hodges, 738 F.3d 266, 274 (11th Cir. 2013).  A plaintiff must first show an objectively serious medical need.  Id.  A serious medical need can encompass "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Mann, 588 F.3d at 1307 (citation omitted).  "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition."  Kuhne v. Fla. Dep't of Corr., 745 F.3d 1091, 1096 (11th Cir. 2014).

Second, the plaintiff must establish that the official acted with deliberate indifference.  Gilmore, 738 F.3d at 274.  To prove "deliberate indifference" to a serious medical need, a plaintiff must show "'(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence.'"  Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (internal quotations and citations omitted).  Not every allegation of inadequate medical treatment states a constitutional violation.  "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference."  Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995).  In either situation, the need must be "one that, if left unattended, poses a substantial risk of serious harm."  Farrow v. West, 320 F.3d 1235, 1245 (internal quotations and citations omitted).  "The plaintiff must prove that the defendant 'actually knew' of the risk - '[p]roof that the defendant should have perceived the risk, but did not, is insufficient.'"  Kruse v. Williams, 592 F.App'x 848, 856 (11th Cir. 2014) (citation omitted) (brackets in original).  Additionally, an official "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  Farmer,

30

511 U.S. at 844.  Third, a distinction must be made between deliberate indifference and gross negligence.  See McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (collecting categories of action or inaction that may constitute deliberate indifference).[13] "Conduct that is more than mere [gross] negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all."  McKeithen v. Jackson, 606 F. App'x 937, 939 (11th Cir. 2015) (citing McElligott, 182 F.3d at 1255), cert. denied, 136 S. Ct. 802, 193 (2016).

With regard to gross negligence in a delay-of-treatment case, the relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay."  Goebert v. Lee Cty., 510 F.3d 1312, 1327 (11th Cir. 2007).  "Deliberate indifference in the form of an unreasonable delay is cognizable when prison officials delay treatment for life-threatening emergencies, but also in 'situations where it is apparent that delay would detrimentally exacerbate the medical problem.'"  Jacoby v. Baldwin Cty., 596 F. App'x 757, 767 (11th Cir. 2014) (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187-88 (11th Cir.1994), abrogated on other

---

[13] The Eleventh Circuit has stated that deliberate indifference requires proof of more than gross negligence:

> Although we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of "more than mere negligence," McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir.1999), our earlier holding in Cottrell, 85 F.3d at 1490, made clear that, after Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a claim of deliberate indifference requires proof of more than gross negligence.

Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010); see Johnson v. Razdan, 564 F. App'x 481, 485 n.4 (11th Cir. 2014) (same).

grounds by <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002).  Moreover, "the fact that a prisoner's ailment may be incurable does not relieve the prison system of its obligation to provide palliative care."  <u>Russell v. Williams</u>, No. CV408-058, 2008 WL 4974801, at *3 (S.D. Ga. Nov. 21, 2008) (citing <u>Washington v. Dugger</u>, 860 F.2d 1018, 1021 (11th Cir. 1988)).

Plaintiff's claim must be viewed through the prism of qualified immunity. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted).  "'Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.'"  <u>Youmans</u>, 626 F.3d at 562 (quoting <u>Lassiter v. Ala. A&M Univ., Bd. of Trs.</u>, 28 F.3d 1146, 1149 (11th Cir.1994)).  "[O]nce a defendant raises the defense, the plaintiff bears the burden of establishing both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation."  <u>Youmans</u>, 626 F.3d at 562 (citing <u>Pearson v. Callahan</u>, 555 U.S. 223, 230 (2009)).  It is within the Court's discretion to "consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated."  <u>Youmans</u>, 626 F.3d at 562.

To obtain qualified immunity, a public official must first show that he was engaged in a discretionary duty when the allegedly wrongful act occurred. <u>Dalrymple v. Reno</u>, 334 F.3d 991, 995 (11th Cir. 2003).  The parties do not dispute that all of the Defendant doctors were acting within the scope of their discretionary authority as FDOC health care

providers.  Thus, the burden shifts to Plaintiff to show that qualified immunity is not
appropriate.  Dalrymple, 334 F.3d at 995; see also Kesinger ex rel. Estate of Kesinger v.
Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004).  To meet this burden, Plaintiff must
satisfy a two-part test.   McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009).
First, Plaintiff must show that Defendants' conduct violated a constitutional right.  Id.
Assuming a violation occurred, Plaintiff must also show that the right was clearly
established at the time of the incident.  Id.  The Court may decide these two issues in
either order, but to survive a defendant's assertion of qualified immunity, Plaintiff must
make both showings. See Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014); Maddox v.
Stephens, 727 F.3d 1109, 1120-21 (11th Cir. 2013).

When considering qualified immunity on a defendant's motion for summary
judgment, the court considers the record in the light most favorable to the plaintiff,
eliminating all issues of fact.  "'By approaching the record in this way, the court has the
plaintiff's best case before it. . . . [M]aterial issues of disputed fact are not a factor in the
court's analysis of qualified immunity and cannot foreclose the grant or denial of summary
judgment based on qualified immunity[.]'"  Penley v. Eslinger, 605 F.3d 843, 848 (11th
Cir. 2010) (citation omitted).

**B.**   **RMC Doctors Smith and Belizaire**

Defendants contend that it is undisputed that upon discharge from Memorial
Hospital, Plaintiff's acute cerebritis and cerebellitis were no longer life-threatening.  (Doc.
83; Defendants' Motion at 9).  They argue that Drs. Smith and Belizaire were not
deliberately indifferent to Plaintiff's serious health needs by not following the Memorial
Hospital discharge order that Plaintiff receive multiple therapies daily and close

33

observation by a neurologist and infectious disease specialist weekly because "orders [were] written and [Plaintiff] did receive specialty follow-up appointments (neurology and infectious disease)."  Id.; see also id. at 10, 23.  As to the timing and amount of therapy, Defendants argue that Drs. Smith and Belizaire's "decision falls into the realm of medical judgment," and thus cannot constitute deliberate indifference in the constitutional sense. Id. at 10.

As to just Dr. Smith,  Defendants contend that the evidence establishes that Dr. Smith had only one contact with Plaintiff which occurred on June 7, 2010, when Plaintiff was discharged from Memorial Hospital, and that on this date Dr. Smith wrote orders for Plaintiff to have a two-week speciality follow-up with infectious disease and neurology specialists.  Defendants' Motion at 18.  They argue that "[t]here is no evidence that Dr. Smith had Plaintiff's discharge orders at the time of his contact with [Plaintiff]."  Id. at 4, 18.  Additionally, Defendants contend that Dr. Smith should be shielded from liability because his "only other involvement was to, administratively, approve Dr. Belizaire's consultation requests."  Id. at 4, 18-19.

Defendants argue that Dr. Belizaire saw Plaintiff "nearly everyday" as Plaintiff's primary care physician at RMS and wrote therapy orders.  Defendants' Motion at 19. They maintain that the frequency of those orders and actual therapies is a "classic example of a matter of medical judgment," and thus cannot form the basis for a deliberate indifference claim.  Id. at 19-20, 21-22.  Moreover, Defendants cite to the fact that "Plaintiff did receive these therapies."  Id. at 20.

Defendants also contend that the evidence indisputably establishes that the conduct of Drs. Smith and Belizaire did not cause Plaintiff's injury.  See Defendants'

34

Motion at 19.  Defendants argue that the "timing" of Plaintiff's follow-up appointments had

no impact on Plaintiff's current condition.  Id. at 9.  Rather, they contend that the speech,

physical and occupational therapy do not treat brain inflammation.  Defendants argue that

because Plaintiff remained "clinically stable," that is, her brain injury and physical

disabilities did not worsen from June 7, 2010 until Plaintiff's release in July 2011, the

conduct of Drs. Smith and Belizaire did not "cause" Plaintiff any injury.  Id. at 18; see also

id. at 21 (arguing that the evidence establishes "that Plaintiff remained clinically stable

during her incarceration as did her neurologic[al] condition.").  In short, Defendants'

premise is that Plaintiff's injury was caused by her cerebritis and cerebellitis, not the

amount of therapies Plaintiff received.

Plaintiff responds that Defendants wrongly attempt to combine the treatment for

Plaintiff's cerebritis with the treatment for its sequella - ataxia, extreme weakness, slurred

speech and nystagmus.  (Doc. 95; Plaintiff's Response at 4-5).  Additionally, Plaintiff

argues that there is no evidence in the record that Dr. Belizaire relied on his medical

judgment in connection with the provision of follow-up therapy and specialist care

provided to Plaintiff, or expressed a medical reason to decrease the level of care ordered

by the Memorial Hospital Discharge Summary.  Plaintiff's Response at 14-15.

### 1.   **Serious Medical Need**

According to the doctors at Memorial Hospital on June 6, 2010, when they

discharged Plaintiff to the care of RMC,

> This patient's care is not finished by any stretch of
> imagination.  She needs close ID [infectious disease] and
> neurology follow up.  She needs close clinician daily follow up.
> She needs physical therapy, speech therapy and occupational
> therapy daily.

(Doc. 95-1at 3; 6/6/10 Discharge Summary).  Her treating neurologist testified that "[m]ost of the medical care would have started from then on, which is the rehabilitation, both physical rehabilitation, occupational rehabilitation, speech therapy, and avoiding complications . . . ."  (Doc. 78; A. Nabizadeh Dep. at 31).  After the acute phase of cerebellitis is stabilized, "then we try to start the neuro rehabilitation right away to prevent - not only to improve the function, but also to prevent the deterioration of some of it."  Id. At 33.  "[W]e try to start it very quickly after the patient becomes stable and continue."  Id. Thus, Plaintiff presented with a physician-diagnosed, serious medical need to the doctors at RMC which mandated treatment.  See Mann, 588 F.3d at 1307.

When Plaintiff arrived at RMC on June 7, 2010, she spoke very slowly and with very slurred speech, and walked with difficulty, needing assistance. (Doc. 83-10; Dr. Belizaire 6/8/10 Note); (Doc. 72; Belizaire Dep. at 15).  Given the admonition by the Memorial Hospital doctors, the evidence of Plaintiff's condition of acute ataxia, and the testimony of Memorial Hospital neurologist Dr. Aarastoo Nabizadeh and Plaintiff's expert Dr. John Merritt regarding Plaintiff's chances of further recovery with the ordered therapies, the evidence and its inferences, when construed in favor of Plaintiff, establishes that Drs. Smith and Belizaire were presented with a patient with a serious medical need, for Eighth Amendment purposes.

## 2.    Deliberate Indifference

As set forth above, "[d]eliberate indifference may be demonstrated by a complete denial of readily available medical treatment and by delay of necessary treatment for non-medical reasons."  Thomas v. Poveda, 518 F. App'x 614, 616 (11th Cir. 2013) (citing Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011)).  "'In cases that turn on the

delay in providing medical care, rather than the type of medical care provided,'" the Court considers "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Thomas, 518 F. App'x at 616 (quoting Goebert, 510 F.3d at 1327). "A plaintiff cannot establish deliberate indifference simply by second guessing the conclusions reached by a prison medical official in the exercise of his medical judgment." Bismark v. Fisher, 213 F. App'x 892, 896 (11th Cir. 2007).

> Indeed, 'the question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.'

Bismark, 213 F. App'x at 896 (quoting Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995)).  However, "'[i]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out.'" Fields v. Corizon Health, Inc., 490 F. App'x 174 (11th Cir. 2012) (quoting Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985)).  Thus, if a jury could conclude that prison doctors delayed treatment to save money, which is not a medical justification, a claim of deliberate indifference may be made.  See Fields, 490 F. App'x at 185.  Plaintiff must ultimately prove that Drs. Smith and Belizaire disregarded a serious risk of harm they were subjectively aware of by conduct that was more than gross negligence.  See Townsend, 601 F.3d at 1158.

The failure to provide physical therapy (or other therapies) to assist in recovery of a patient inmate has been recognized by courts as the basis for a deliberate indifference claim. For example, Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993), an inmate who

37

suffered a cerebral vascular incident which caused his left foot to drag and weakness in his left arm, a back injury, and a stroke which further weakened his left arm and leg, was unable to continue his prescribed physical therapy when he was incarcerated.  991 F.2d at 65-66.  Despite multiple recommendations, id. at 66, the inmate never received the requested therapy, until it was determined that physical therapy would no longer be necessary because "too much time had elapsed for the therapy to be effective."  Id. at 66-67. The Third Circuit reversed summary judgment in favor of the defendant doctors holding that a genuine issue of fact existed as to whether the inmate's physician in charge knew that the inmate should receive physical therapy and deliberately failed to provide it without a medical reason.  991 F.2d at 68.  The Court explained that while medical judgment may have been the reason for the doctor's delay in providing physical therapy, "there is some evidence in the record suggesting that Dr. O'Carroll might have had a motive for deliberately avoiding physical therapy, namely, that physical therapy would have placed a considerable burden and expense on the prison and was therefore frowned upon throughout the prison health system."  Id. at 68.  The court determined that it was "therefore important that the trier of fact hear [the doctor's] testimony in order to assess his credibility."  Id. at 69; see also Vinzant v. United States, 584 F. App'x 601, 602 (9th Cir. 2014) (finding that the district court erred in granting summary judgment on the inmate's Eighth Amendment deliberate indifference claim with respect to the physical therapy scheduling delay for inmate's injuries sustained in an automobile accident where he was a passenger in a vehicle driven by a United States deputy); Lancaster v. Valdez, No. CV 09-683-S-CWD, 2011 WL 2470680 (D. Idaho June 20, 2011) (denying summary judgment in favor of prison doctors who were in some part responsible for the inmate's

care, finding that as a matter of constitutional law, the failure to provide the left-handed inmate with any range-of-motion physical therapy for a broken arm which resulted in a "frozen left elbow joint[,]" consistent with three previous doctors' orders, supported a reasonable inference that defendant doctor was deliberately indifferent to the inmate's medical needs).

Dr. Smith, who admitted Plaintiff to RMC on June 7, 2010, knew that Plaintiff had been discharged from Memorial Hospital to RMC after treatment for cerebritis and cerebellitis, and that she should have come with her medical records.  (Doc. 81; Smith Dep. at 21).  While Dr. Smith states that he does not remember whether he saw the Memorial Hospital Discharge Order, id. at 12, he did recommend a two week follow-up at Memorial Hospital with Drs. Chang and Nabizadeh, and he prescribed medication.  (Doc. 83-7; Dr. Smith's 6/7-8/10 Notes); (Doc. 81; Smith Dep. at 16).  That Dr. Smith specifically identified the Memorial Hospital specialists whom Plaintiff should see in two weeks, continued Plaintiff's medications, and ordered physical therapy, at a minimum, creates a factual question that he saw the Memorial Hospital Discharge Order, which recommended a one-week follow-up, immediate daily therapy, and specifically mentioned Dr. Nabizadeh. Thus, there is evidence from which a reasonable jury could find that Dr. Smith was subjectively aware of Plaintiff's serious medical need.

Dr. Smith said he does not remember why he ordered neurology and infectious disease follow-up in two weeks instead of one week.  (Doc. 81; Smith Dep. at 16).  Nor could Dr. Smith answer why there was such a delay in Plaintiff's follow-up specialty care, despite his June 7, 2010 Order.  Id. at 21-29.  He states that he had "no idea" whether Plaintiff ever received the ordered physical therapy.  Id. at 41.

Dr. Smith testified that Dr. Belizaire, as the attending physician, would have been responsible for compliance with the orders for neurology and infectious disease follow-ups and for therapy.  (Doc. 81; Smith Dep. at 33).  However, according to Dr. Belizaire, he would have discussed Plaintiff's case with Dr. Smith every week, and Dr. Smith would have had a role in Plaintiff's care during "rounds."  (Doc. 72; Belizaire Dep. at 20); see also, Vinzant v. United States, No. EDCV 07-00024 VAP (AJW), 2011 WL 6132741, at *22 (C.D. Cal. Sept. 2, 2011) (finding that a doctor's signature on the consultation request and medical chart is sufficient to establish a genuine factual dispute as to his involvement in the delay in providing physical therapy for inmate's injuries sustained in an automobile accident), report and recommendation adopted in part, rejected in part, No. EDCV 07-0024 VAP(AJW), 2011 WL 6133698 (C.D. Cal. Dec. 8, 2011), aff'd in part, rev'd in part and remanded, 584 F. App'x 601 (9th Cir. 2014) (agreeing that summary judgment should not be entered on the inmate's deliberate indifference claim).

Dr. Smith failed to muster even a hint that medical judgment colored his decision to order specialty consultations in two weeks rather than one, and ordered only physical therapy. (Doc. 81; Smith Dep. at 42 ("The only thing I can think of is . . . I didn't have [the Memorial Hospital Discharge Order]. . . .")).  Nor did he testify that he exercised any medical judgment with regard to the delay in follow-up treatment, which would have been evident to Dr. Smith in his review of Dr. Belizaire's subsequent orders.  See Vinzant, 2011 WL 6132741, at *22 ("[D]efendants have not shown that the delay in scheduling physical therapy was based on a medical judgment.").  Construing these facts in a light most favorable to the Plaintiff, a jury could conclude that Dr. Smith did read the Memorial Hospital Discharge Order when admitting and evaluating Plaintiff on June 7, 2010, and

that he chose to order follow-up with the specialists in two weeks rather than one week for non-medical reasons.  Moreover, the evidence can be construed to suggest that Dr. Smith was aware of Plaintiff's care and treatment throughout Plaintiff's stay at RMC, and that he did not provide the required therapies for reasons other than medical judgment, despite having subjective knowledge of the medical need for the ordered therapies.

Dr. Belizaire testified that RMC was "to continue with [Plaintiff's] care . . . and have her seen by some other subspecialties."  (Doc. 72; Belizaire Dep. at 17).  "She was to continue with the same care that she was getting [at Memorial Hospital], and so essentially we provided that." Id. at 18; see also id. at 19.  Dr. Belizaire said that the Memorial Discharge Order should be available.  Id. at 19.  He also agreed that, as Plaintiff's attending physician, he was responsible of ensuring that Plaintiff received the proper therapies and treatment.  Id. at 47.  He said that the therapies were approved because "the purpose basically is to improve whatever movement she had left, to strengthen it."  Id. at 50.

Dr. Belizaire acknowledged that "we are working with inmates, but within the scope of the medicine, we . . . have to work with the policies and procedures also. . . .  These apply whenever we go out of bound."  (Doc. 72; Belizaire Dep. at 10).  In response to questions at his deposition, Dr. Belizaire answered as follows:

> Q:     Are there limitations within the Department of Corrections on the things that you can get for patients there or get done for patients there?
>
> A:     Theoretically we should be able to get things done if it's approved.
>
> Q:     But that would be the medical director's responsibility?

> A:      Exactly.
>
>                               . . .
>
> Q:      . . . Is cost or maybe an expense of a particular
> treatment or a therapy a consideration within the Department
> of Corrections?
>
> A:      In any practice, I would say.
>
> Q:      So that would be a yes?
>
> A:      I would say yes, in any practice.

Belizaire Dep. at 30-31.  Dr. Belizaire did not testify that he exercised any specific

medical judgment in his follow-up on Plaintiff's physical, occupational and speech

therapy, ordered in the Memorial Hospital Discharge Summary. (Accord Doc. 75; Halperin

Dep. at 23 (agreeing that the contemporaneous records do not indicate that physicians at

RMC determined that recommended daily therapy sessions were not appropriate)).

Dr. Belizaire acknowledges that the RMC was charged with continuing the care

that had been provided by Memorial Hospital, which included daily therapies.  However,

the evidence establishes that Plaintiff did not receive her first physical therapy until more

than ten weeks after it was ordered by the Memorial Hospital specialists, and she never

received occupational therapy.  As set forth above, deliberate "indifference can be

manifested by prison doctors in taking the easier and less efficacious route in treating an

inmate."  Washington, 860 F.2d at 1021 (citation omitted).  Here, construing the evidence

in favor of Plaintiff, Dr. Belizaire's and Dr. Smith's conduct may be "so grossly contrary to

accepted medical practices as to amount to deliberate indifference." See  Howell v.

Evans, 922 F.2d 712, 720 (11th Cir. 1991), vacated by settlement, 931 F.2d 711 (11th

Cir. 1991), reinstated by order, 12 F.3d 190 (11th Cir. 1994).  Moreover it is reasonable to

infer from the evidence that Dr. Belizaire, as Plaintiff's attending physician, did not ensure that the ordered intensive daily therapies were provided to Plaintiff because of cost. Finally, it is reasonable to infer from the record evidence that Dr. Belizaire had subjective knowledge of the immediate need for intensive therapies ordered, and he declined to provide those treatments for reasons other than medical judgment.

While a difference of opinion or a dispute about the proper course of treatment or the timing of treatment do not give rise to a section 1983 claim of deliberate indifference, see Massey v. Montgomery Cty. Detention Facility, No. 15-11025, 2016 WL 1138580, at *3 (11th Cir. Mar. 24, 2016), there is no evidence that Drs. Smith and Belizaire had a difference in opinion with the Memorial Hospital specialists or that they made an independent medical judgment regarding the best course of treatment in the form of physical, occupational, and speech therapy for Plaintiff, or the timing of that therapy. Accordingly, construing the evidence in favor of Plaintiff, the Court finds that there are genuine issues of fact with regard to Dr. Smith's and Dr. Belizaire's deliberate indifference to Plaintiff's serious medical need.

### 3.   Causation

"The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry."  McDaniels v. Lee, 405 F. App'x 456, 458 59 (11th Cir. 2010) (citing Goebert, 510 F.3d at 1329).

> To survive summary judgment, a plaintiff must show that the delay attributable to the defendant's indifference likely caused the plaintiff's injury.  An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.

McDaniels, 405 F. App'x at 458-59 (citations omitted).  A "medical causation issue

presents a technical and scientific issue that requires the specialized knowledge of an

expert medical witness."  Wingster v. Head, 318 F. App'x 809, 815 (11th Cir. 2009).

Plaintiff has offered the testimony of two experts which supports her argument that

Dr. Smith and Belizaire's failure to provide physical, occupational and speech therapy,

contrary to the consulting specialists' orders. Plaintiff has also offered evidence that this

failure caused her injury to the extent that she was precluded from recovering from

cerebritis and cerebellitis, and their sequallae to the fullest extent possible.  Dr. Merritt

opines that had Plaintiff "did not receive the appropriate intensive physical occupational

and speech therapy during an essential window of time that would have minimized her

neurological impairments, and provided her the best opportunity for functional gains."

(Doc. 83-3; Merritt Report).  He states that with proper physical therapy, she could have

regained between 50 and 90 percent of her physical functional capacity had she received

the ordered intensive daily physical, occupational and speech therapy for a six month

period following her discharge from Memorial avoiding.  (Doc. 77; Merritt Dep at 45-47,

68, 70-71).  Plaintiff's expert Dr. Donald C. Kern expressed the opinion that Plaintiff's

"lack of continued improvement was due to the interruption of the therapies she was

receiving in the hospital."  (Doc. 4; Kern Aff. at 5-6); (Dc. 94-1 at 9; Kern Report).  He

stated that "[t]he best chance to achieve improvement in function after brain injury is in

the first several months after the event ."  Id.

In addition to the Plaintiff's expert testimony, Dr. A. Nabizadeh, the neurologist who

treated Plaintiff at Memorial Hospital, said that he ordered the daily therapies because

upon discharge from the hospital, "[m]ost of the medical care would have started from

44

then on, which is the rehabilitation, both physical rehabilitation, occupational

rehabilitation, speech therapy, and avoiding complications . . . ."  (Doc. 78; A. Nabizadeh

Dep. at 31).  Dr. Nabizadeh said that after the acute phase of cerebellitis is stabilized, "we

try to start neuro rehabilitation right away to prevent - not only to improve the function, but

also to prevent the deterioration of some of it."  Id. at 33.  Finally, there is evidence in the

record to support a finding that Plaintiff's physical and speech capabilities did improve

while at Memorial Hospital where she was receiving daily physical, occupational, and

speech therapy.  (Doc. 94; Kern Aff. at 3).  The expert testimony and the evidence in the

record and the inferences to be drawn from it, when construed in a most light favorable to

Plaintiff, establish a genuine issue of fact with regard to the causation element of

Plaintiff's deliberate indifference claim.

     To be sure, Defendants' experts disagree.  Dr. Corey Evans opined that Drs. Smith

and Belizaire "adequately, appropriately and timely addressed all of [Plaintiff's] specific

medical needs, noting that they ordered the physical and speech therapy.  (Doc. 83-8;

Evans Report ¶ 5); (Doc. 74; Evans Dep. at 34).  Dr. John Halperin stated that Plaintiff's

injury was caused by the irreversible cerebellar atrophy, and that aggressive physical

therapy would not have returned Plaintiff to her prior baseline or improve her brain

atrophy.  (Doc. 83-1 at 3; Halperin Report).  He said that the recommended intensive

therapies may have improved Plaintiff's functioning by five to ten percent, which he

characterized as a "guesstimate."  (Doc. 75; Halperin Dep. at 25-26).

     Which expert testimony is to be credited over the other is a matter for the trier of

fact to resolve, and not for the Court to decide on summary judgment; the Court may not

determine during summary judgment whether Plaintiff's or Defendants' experts are more

credible or persuasive.  "'Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by the finder of fact and not a court deciding summary judgment.'" <u>Delaware Valley Floral Grp., Inc. v Shaw Rose Nets, LLC</u>, 597 F.3d 1374, 1381 (Fed. Cir. 2010) (citation omitted).  Plaintiff's experts' reports and testimony, coupled with Plaintiff's medical records and the factual evidence in this record, is sufficient to establish a genuine issue of material fact as to the issue of causation.

### 4.    Clearly Established Law

As set forth above, the evidence, when construed in the light most favorable to Plaintiff, establishes an issue of fact that Drs. Smith and Belizaire's conduct was deliberately indifferent to Plaintiff's serious medical need, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment, and that the deliberate indifference caused Plaintiff's injury.  The Court turns to whether Drs. Smith and Belizaire had fair notice that their conduct was constitutionally unsound.

To be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  <u>Plumhoff</u>, 134 S. Ct. at 2023.  "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendant[ ] that [his] alleged [conduct] was unconstitutional.'" <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866 (2014) (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002)).  "[T]he preexisting law must give real notice of practical value to government officials, considering the specific circumstances confronting them, and not just talk of some generalized, abstract intellectual concept."  <u>Pace v. Capobianco</u>, 283 F.3d 1275, 1282 (11th Cir. 2002).  In the context of a medical indifference case, a plaintiff seeking to overcome a qualified

immunity defense must demonstrate that the actions of the physician "violated a clear and specific standard and that similarly situated reasonable health care providers would have known that their actions violated [the plaintiff's] constitutional right." Adams v. Poag, 61 F.3d at 1543.  The plaintiff may demonstrate the existence of a clearly established medical standard "either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession." Id.

At the time of their conduct, Eleventh Circuit precedent was well established that officials who have knowledge of the need for medical care and intentionally refuse to provide that care are deliberately indifferent to the needs of an inmate.  See, e.g., Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) ("Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference.").  In 1986, the Eleventh Circuit recognized that the failure to provide physical therapy could, in some circumstances, give rise to an Eighth Amendment claim of deliberate indifference to serious medical need.  See Ort v. Pinchback, 786 F.2d 1105 (11th Cir. 1986).  In Ort, an inmate suffered from scoliosis and kyphosis, which caused him to be somewhat humpbacked.  Ort was referred to an orthopedic surgeon, who concluded that the inmate needed physical therapy to improve his gait and his posture.  786 F.2d at 1106.  There was no evidence that the inmate received the physical therapy.  A year and a half later, the inmate saw the same orthopedic surgeon, who again stated that the inmate needed exercise to maintain his strength in his back.  Id.  The inmate was returned to light duty status and was not given any physical therapy.  Id.  In reversing summary judgment for the orthopedic surgeon, a private contractor for the state prison system, the Eleventh Circuit stated:

> Because Ort has sufficiently alleged that Dr. Pinchback and
> the other potential defendants acted with deliberate
> indifference to his serious medical needs, and because there
> remain disputed issues of material fact surrounding the nature
> of the care afforded Ort by the doctors, this case was not
> appropriately resolved by dismissal or summary judgment.

786 F.2d at 1107; see also Russell v. Williams, No. CV408-058, 2008 WL 4974801, at *4

(S.D. Ga. Nov. 21, 2008) (finding that plaintiff adequately alleged that a prison doctor was

deliberately indifferent to the inmate's serious medical need by choosing to continue

known ineffective treatments for painful neck twitching and to not send the inmate to

physical therapy as recommended by a specialist; the court found the doctor's decision

was either more than gross incompetence contrary to accepted medical standards or

made solely to save money).  In Faison v. Rosado, 129 F. App'x 490 (11th Cir. 2005), the

Eleventh Circuit concluded that a prison doctor's failure to follow an orthopedist's

recommendation, as opposed to an order, to refer the inmate to a physical therapist for

instruction regarding proper weight-bearing in order to prevent the inmate's osteoporosis

from progressing, did not constitute deliberate indifference to the inmate's serious

medical need.  129 F. App'x at 492.  The Court determined that the prison doctor treated

the inmate "consistently" with the orthopedist's recommendation by referring the inmate to

a mid-level practitioner who instructed the inmate on proper range of motion exercises

and weight bearing activities, and the inmate was advised further regarding proper weight

bearing exercises by an orthopedic consultant.  Id.  In these circumstances, the prison

doctor's medical judgment as to the proper method of treatment did not give rise to a

section 1983 claim.  Id.

Here, Drs. Smith and Belizaire were presented with a 21-year old patient who had

just survived acute cerebritis and cerebellitis, and who had resultant cerebellar ataxia which effectively left her non-ambulatory and bound to a wheelchair.  Plaintiff's medical treatment and care had not concluded when she was discharged from Memorial Hospital. Rather, her neurologist and infectious disease doctors emphasized the necessity of her continued care, ordered follow-up visits in a week, and ordered daily intensive therapies to address her serious medical need, evincing the contemporary standards and opinions of the medical profession at the time.  This was clearly not comparable to the situation presented in Faison, supra, where in the prison doctor's medical judgment, instruction on weight bearing exercises would sufficiently address the inmate's osteoporosis.  Drs. Smith and Belizaire had fair warning that failure to provide Plaintiff with the recommended intensive therapies and to ensure her speedy follow-up with the neurologist and infectious disease specialists (who, as Dr. Kern observed, had the "trickle-down effect" of delaying physical, occupational and speech therapy), in these circumstances would constitute deliberate indifference to Plaintiff's serious medical need, in violation of the Eighth Amendment.[14]  For all of the foregoing reasons, summary judgment in favor of Drs. Smith

---

[14]   Likewise, later Eleventh Circuit decisions involving physical therapy for inmates, are also distinguishable.  In Bismark v. Fisher, 213 F. App'x at 897, the Court determined that the physician was not deliberately indifferent despite his failure to adopt the plan of care of an outside podiatrist who had prescribed special shoes for the inmate, where in the physician's medical judgment, sneakers would effectively remediate the inmate's foot condition.  In Thomas, 518 F. App'x at 620, the court held that delay in providing physical therapy to an inmate following knee surgery, was not deliberate indifference, finding that on the record, there was no evidence that the doctor "deliberately delayed post-surgery treatment or acted with callous disregard for [the inmate's] medical condition[,]" where "there [was] no evidence to support a conclusion that the delay was due to more than mere negligence."  And in Williams v. Barrow, 559 F. App'x 979 (11th Cir. 2014), the court found that the the inmate received physical therapy once or twice a week during the three months he was under the defendant prison doctor's care, and that the doctor's decisions amounted to a classic example of medical judgment.

Unlike these case, the Drs. Smith and Belizaire have provided no reason - medical judgment or otherwise - for the their failure to enure the ordered follow-up consultations and therapies.  They provided no alternative treatment and Plaintiff languished without the ordered care.  Moreover, Plaintiff's condition

(continued...)

and Belizaire is due to be denied.

### C.    LCI Doctors Rosario and Colon

Likewise, Defendants contend that Drs. Rosario and Colon were not deliberately indifferent in their care of Plaintiff at LCI following her return on October 7, 2010 and incarceration there through July 2011.  (Doc. 83; Defendants' Motion at 11).  Defendants argue that the record is undisputed that Dr. Rosario provided no hands-on care or treatment to Plaintiff, and that her responsibility at LCI was administrative, approving consultation requests.  Id. at 17.  As to Dr. Colon, Defendants note that it is undisputed that Dr. Colon did not see Plaintiff until January 19, 2011, which is well outside Mr. Merritt's six-month "window of time" for successful therapy treatment of Plaintiff's disabilities.  Id. at 16.  Plaintiff responds that the records reflect that even after Plaintiff returned to LCI, recommendations from specialists that Plaintiff receive physical therapy went unfulfilled.  (Doc. 95; Plaintiff's Response at 12-13).

It is axiomatic that "[e]ach individual Defendant must be judged separately and on the basis of what that person knows."  Jackson v. West, 787 F.3d 1345, 1353 (11th Cir. 2015) (citing Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)).  "The test for deliberate indifference is a subjective test not an objective test for collective knowledge."  Burnette, 533 F.3d at 1331 (citation omitted).

The evidence of Drs. Rosario and Colon's involvement with Plaintiff at LCI after

---

[14](...continued)
was dire and obvious.  The Court finds that the Bismark, Thomas, and Williams decisions do not dictate the result in the case.  In short, Plaintiff has presented compelling evidence of deliberate indifference of her serious medical need, and Defendants have presented no explanation or evidence as to why it was not addressed.  On this record, a trier of fact could reasonably conclude that the reason for Dr. Smith's and Dr. Belizaire's decisions regarding Plaintiff was more than gross negligence or was not medically related.

October 7, 2010 is sparse.  Dr. Rosario first had contact with Plaintiff on December 8, 2010, and Dr. Colon's first contact with Plaintiff was on January 19, 2011.  There is no evidence that Drs. Rosario and Colon were subjectively aware that Plaintiff's specialists had recommended in June 2010 that Plaintiff receive immediate daily intensive therapies, or that Drs. Rosario and Colon declined proper treatment for Plaintiff.  Moreover, it is undisputed that on this record, they came to have knowledge of Plaintiff's condition after the six month "window of time" for optimal therapy, according to Plaintiff's expert, Dr. Merritt, had expired.  There is no evidence that they deliberately or otherwise ignored orders for physical therapy.  Moreover, it was undisputed that Plaintiff had started refusing to attend scheduled speech therapy appointments starting in November 2010.  "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference," Burnette, 533 F.3d at 1331, and Plaintiff cannot impute the alleged failings of physicians at RMC, or of the FDOC on Drs. Rosario and Colon for purposes of finding them individually liable for an unconstitutional deliberate indifference of Plaintiff's serious medical needs. Defendants as movants have met their initial burden of demonstrating, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark, 929 F.2d at 608.   Plaintiff has failed to respond to Defendants' evidence by citing to evidence showing that there is a genuine issue for trial.  See Jeffery, 64 F.3d at 593-94.  The Court determines that on this record, Defendants Drs. Rosario and Colon are entitled to judgment as a matter of law.

## IV.   Plaintiff's Motion for Summary Judgment (Doc. 87)

Plaintiff moves for summary judgment on Defendants' affirmative defenses stated in Defendants' Answer (Doc. 64), arguing that "there is no record evidence in support:

paragraphs 73., 74., 75., 76., 78., 80., 81., 82., 88., 89., 90., 91., 92., 93., 94., 95., 96., 97., 98., 99., 100., 101."  (Doc. 87; Plaintiff's Motion at 3).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark, 929 F.2d at 608.  Even where the non-moving party bears the burden of persuasion at trial, the moving party must "identify[ ] those portions of the . . . [record], which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To allow the moving party to rely on "a conclusory assertion that the nonmoving party has no evidence" without specific references to the record, would permit the use of "summary judgment procedure to be converted into a tool for harassment." Id. at 332 (Brennan, J., dissenting) (agreeing with the Court's legal analysis regarding summary judgment).  Once the parties have offered evidence of their positions, the Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Plaintiff does nothing more than make the conclusory assertion that there is no evidence in the record to support twenty-two affirmative defenses asserted by Defendants, identified only as numbered paragraphs. Plaintiff did not make the effort to articulate specific issues with regard to each affirmative defense referenced, and the Court is not required to do so on its own. Plaintiff's Motion is due to be denied as to Defendants' affirmative defenses.

Plaintiff also moves for summary judgment as to specific elements of its claim of

52

deliberate indifference to Plaintiff's serious medical need.  In essence, Plaintiff moves for a series of partial summary judgments.  As to the first element of the claim, that is, that Plaintiff had a "serious medical need," <u>Mann</u>, 588 F.3d at 1306-07; (Doc. 87; Plaintiff's Motion at 4-6), the Court determines that this is an issue to be determined by the trier of fact.  While without question, Plaintiff suffers from a significant disability, whether her condition after June 7, 2010 constituted a "serious medical need" within the meaning of a Section 1983 Eighth Amendment deliberate indifference claim remains a question of fact. Defendants' expert Dr. Halperin opined that by June 7, 2010, Plaintiff had suffered the serious brain injury due to infection and inflammation, and that physical therapy would not "return [Plaintiff] to her prior baseline nor would such therapies resolve or in any way improve her brain atrophy."  (Doc. 75 at 10; Halperin Dep.).  Dr. Halperin states that as of Plaintiff's discharge from Memorial Hospital, "the dye was cast," and that physical therapy was not going to change that condition (offering a "guesstimate" that the various therapies may have improved her functioning by five percent).  (<u>Id</u>. at 25-26).  Construing this evidence in the light most favorable to Defendants, the Court finds that Dr. Halperin's opinion is sufficient to create a jury question as to whether Plaintiff's physical disabilities constituted a "serious medical need" about which Defendants could be held constitutionally liable for "deliberate indifference."

Plaintiff also moves for partial summary judgment as to several other elements of the claim: (1) that Drs. Belizaire and Smith had "subjective knowledge of a risk of serious harm to Plaintiff," and Defendants' Affirmative defense stated in paragraph 85 of their Answer, (Doc. 64 at 9), asserting that "Defendants did not have actual knowledge of harm of the risk posed by Simmons' condition"  (Doc. 87; Plaintiff's Motion at 7-9); (2) that Dr.

Belizaire disregarded the risk of serious harm to Plaintiff (Doc. 87; Plaintiff's Motion at 9-10); (3) that Dr. Belizaire's conduct was more than gross negligence (id. at 11-13); and (4) causation (while not precisely defined by Plaintiff in her motion, presumably as causation relates to the conduct of Drs. Smith and Belizaire).  Id. at 14-17.

As set forth above, the Court concludes that there are genuine and disputed issues of material fact precluding entry of summary judgment on Plaintiff's Count III deliberate indifference claim brought against Defendants Page A. Smith and Witchner Belizaire regarding the care they provided to Plaintiff while she was housed at RMC between June 7, 2010 and October 7, 2010, and the elements of that claim.  Accordingly, Plaintiff's Motion for Summary Judgment, and all of its components, is due to be denied.

Upon due consideration, it is hereby

**ORDERED**:

1.      The claims raised by Plaintiff Stephanie Simmons against Defendant Robert A. Delp in the Amended Complaint (Doc. 27) are **DISMISSED with prejudice**.

2.      Defendants Florida Department of Corrections, Yadirma Colon, Luz Rosario, Witchner Belizaire and Page A. Smith's Dispositive Motion for Final Summary Judgment (Doc. 83) is **GRANTED IN PART AND DENIED IN PART** as follows:

> A.      The Motion is **GRANTED** as to **Count I** of the Amended Complaint (Doc. 27).
>
> B.      The Motion is **DENIED** as to **Count III** of the Amended Complaint (Doc. 27) as it applies to Defendants Page A. Smith and Witchner Belizaire.
>
> C.      The Motion is **GRANTED** as to **Count III** of the Amended Complaint

(Doc. 27) as it applies to Defendants Luz Rosario and Yadirma Colon.

3.      Plaintiff's Dispositive Motion for Summary Judgment and Motion for Voluntary Dismissal of Counts I and II (Doc. 87) is **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, this **_20th_** day of April, 2016.

_____
BRIAN J. DAVIS
United States District Judge

jl

Copies furnished to:

Counsel of Record